UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- X

AXIS MINERAL RESOURCES SA,

                    Petitioner,

    -against-

REPUBLIC OF GUINEA,

                    Respondent.

---------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO. 1:25-Civ-6854

**PETITION AND MEMORANDUM OF LAW TO COMPEL ARBITRATION**

      1.      Petitioner Axis Mineral Resources SA ("Axis"), by and through its undersigned counsel, petitions this Court for an order under Section 206 and/or Section 4 of the Federal Arbitration Act ("FAA") compelling Respondent the Republic of Guinea ("Guinea") to arbitrate disputes the Parties have entrusted to resolution by arbitration.

      2.      Axis and Guinea's relationship stems from a mining permit issued under Decree D/2018/267/PRG/SGG, dated November 2, 2018 (the "Operating Permit"),[1] by means of which Guinea granted Axis the exclusive right of reconnaissance, prospecting, operation, and free disposal of bauxite within a certain area, in exchange for Axis's agreement to pay Guinea certain specified fees, duties, royalties, and costs and preferring Guinean workers, among other things.

      3.      The Parties' relationship was subject to and incorporated Law L/2011/006/CNT of September 9, 2011, of the Mining Code of the Republic of Guinea, as amended by Law L/2013/053/CNT of April 8, 2013 (the "Mining Code"),[2] which allows an aggrieved party to

---

[1] Exhibit A, Decree D/2018/267/PRG/SGG Granting an Industrial Mining Operating Permit to Axis Minerals Resources - S.A. [Official French version and English translation].

[2] Exhibit B, Law No. L/2011/006/CNT of 9 September 2011 establishing the Mining Code of the Republic of Guinea [Official French version as published in the Journal Officiel (Official Gazette) dated September 2011]; Exhibit C, Law No. L/2013/053/CNT of 8 April 2013 amending certain provisions of Law No. L/2011/006/CNT of 9 September 2011 establishing the Mining Code of the Republic of Guinea [Official French version]; Exhibit D,

submit any disputes arising out of the mining relationship to international arbitration in a seat of that party's choosing.

4.      On May 14, 2025, the President of Guinea issued "Decree D/2025/0067/PRG/CNRD/SGG on the Withdrawal of Mining Concessions, Industrial Operating Permits and Semi-Industrial Operating Permits Granted to Companies" (the "May 14 Decree"),[3] pursuant to which Guinea unlawfully purported to revoke Axis's Operating Permit.

5.      This purported revocation was contrary to Guinean law for numerous reasons, including that it lacked proper notice and a proper ground for revocation.

6.      Since the May 14 Decree, Axis has attempted to amicably resolve this dispute, but Guinea has been unresponsive.

7.      On July 10, 2025, Axis exercised its rights under the Operating Permit and Mining Code and served Guinea with a notice of arbitration, which commenced an ad hoc international arbitration in New York City, proposing application of the (2018) CPR International Non-Administered Arbitration Rules ("CPR Rules"), published by the International Institute for Conflict Prevention & Resolution ("CPR"), before a three-person tribunal (the "Notice of Arbitration").[4]

8.      Guinea has refused to participate in the arbitration.

9.      Therefore, Axis brings this petition to compel Guinea to arbitrate this dispute in the manner in which Axis has proposed or, alternatively, as the Court may direct.

---

Consolidated Mining Code [Law No. L/2011/006/CNT of 9 September 2011, as amended by Law No. L/2013/053/CNT of 8 April 2013] [Unofficial French version]; Exhibit E, Certified English Translation of Relevant Mining Code Provisions.
[3] Exhibit F, Decree D/2025/0067/PRG/CNRD/SGG on the Withdrawal of Mining Concessions, Industrial Operating Permits, and Semi-Industrial Operating Permits Granted to Companies [Official French version and English translation].
[4] Exhibit G, Notice of Arbitration [Official English version and French translation], dated July 10, 2025.

10.     In support of this petition, Axis submits Exhibits A – AA, as well as the declarations of Vasundhara Oswal and Mikaël Schinazi, which authenticate these exhibits and provide further support. The affidavits of Anne Fort and Olivier Delépine certify the accuracy of the translations provided.

## PARTIES

11.     Petitioner Axis is a *Société Anonyme* incorporated under the laws of the Republic of Guinea, with company number RCCM/GC-KAL/044.314A/2013. Its registered office is Résidence Corail, Bloc F - Suite 1004, Quartier Camayenne, Commune of Dixinn, BP: 5099, Conakry, the Republic of Guinea.

12.     Respondent Guinea is a foreign sovereign within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

### A.     Subject-Matter Jurisdiction

13.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1330(a) of the FSIA, which grants federal courts original jurisdiction over actions against a foreign state "to which the foreign state is not entitled to immunity either under sections 1605–1607"; 28 U.S.C. § 1605(a)(6), the so-called "arbitration exception" to the FSIA; and 9 U.S.C. § 203, which provides original jurisdiction over "[a]n action or proceeding falling under the Convention" on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (also known as the "New York Convention").

14.     Under the FSIA, foreign states are generally immune from suit in U.S. courts unless an exception enumerated in 28 U.S.C. §§ 1605-1607 applies. 28 U.S.C. § 1604; *CC/Devas v. Antrix*, 145 S. Ct. 1572, 1576 (2025). When an exception applies, § 1330(a) of the FSIA vests federal courts with "original jurisdiction" over such claims. *Antrix*, 145 S. Ct. at 1576.

15.     The arbitration exception in § 1605(a)(6) applies when:

the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

16.     To satisfy the arbitration exception, Axis must show (1) that Guinea has agreed to arbitrate disputes arising out of a defined legal relationship that are capable of settlement by arbitration in the United States, and (2) that one of subsections (A) – (D) applies. It is clear that Guinea has agreed to arbitrate, and Axis satisfies both subsections (A) and (B).

### *Agreement to Arbitrate Disputes From a Defined Legal Relationship*

17.     The Parties have a written agreement to submit to arbitration differences which have arisen from their legal relationship stemming from the Operating Permit and the Mining Code. The Parties formed this agreement in two ways.

18.     First, parties to an agreement can validly incorporate an arbitration provision by reference if they describe "it in such clear and unambiguous terms that its identity can be ascertained beyond reasonable doubt." *Pagaduan v. Carnival Corp.*, 709 F. App'x 713, 715 (2d Cir. 2017).

19.     The Operating Permit, signed and agreed to by the Guinean president, is specifically made "having regard to" Law L/2011/006/CNT of September 9, 2011, on the Mining Code of the Republic of Guinea, as amended by Law L/2013/053/CNT of April 8, 2013

(previously defined as the "Mining Code"), and thus incorporates its provisions.[5] *See Pagaduan*, 709 F. App'x at 715 (finding a contract incorporated a document containing an arbitration provision when the contract was made "in accordance with" the referenced document).

20.    The purpose of the Mining Code is to encourage exploration for and development of mineral resources through a mutually beneficial partnership with investors, and the scope of the Mining Code covers staking, exploration, operation, possession, holding, circulation, trade and processing of mineral or fossil substances and the fiscal regime applicable to such activities.[6]

21.    Article 219 of the Mining Code provides:

> Disputes between one or more mining investors and the State with regard to the extent of their rights and obligations, the performance or non-performance of their commitments at the end of their Titles and the assignment, transfer or Lease of their rights resulting therefrom may be subject to the procedure for amicable settlement.
>
> If a party believes that the procedure of amicable settlement has failed, the dispute shall be submitted either to the competent Guinean courts or to national <u>or international arbitration.</u>
>
> In all other cases, disputes arising from the interpretation and implementation of this Code are to be brought before the competent Guinean courts.[7]

22.    Guinea and Axis thus incorporated the arbitration provision of Article 219 into the Operating Permit.

23.    Second, when a sovereign passes a law "containing a provision for arbitration, the [law] 'constitutes a standing offer to arbitrate disputes covered by the [law],'" and an "investor's written demand for arbitration completes the agreement in writing to submit the dispute to arbitration.'" *See Olin Holdings Ltd. v. State*, 73 F.4th 92, 102 (2d Cir. 2023).

---

[5] Exhibit A, at 1.
[6] Exhibit E, arts. 2, 6.
[7] Exhibit E, art. 219 (emphasis added).

24.    Guinea agreed to the provisions of the Mining Code by the legislature's passage of the Code and the President signing it into law.[8]

25.    Guinea's passage of Article 219 thus constitutes a standing writing offer to arbitrate disputes with mining investors.

26.    In either case, as explained in paragraphs 86-99 below, Axis agreed to and availed itself of this arbitration provision by sending signed letters seeking amicable settlement with Guinea and, after such settlement failed, electing in its Notice of Arbitration to arbitrate this dispute pursuant to Article 219 of the Mining Code. These writings, combined with Guinea's offer in Article 219, constitute a written agreement.

27.    Further, Axis is a mining investor as specified in Article 219, which includes entities that are authorized to conduct mining activity in Guinea, including holders of Permits, Authorisations and Concessions. Prior to Axis Minerals holding an Operating Permit, it held a Prospecting Permit. As explained in paragraphs 58-69 below, for over a decade Axis Minerals has made pecuniary and nonpecuniary investments in Guinea, through all phases of the mining cycle, including prospecting, exploration and extraction.

28.    And as explained in paragraphs 70-85 below, the Operating Permit and the Mining Code define Axis's legal relationship with Guinea, and a dispute exists over Axis's rights under each with respect to the grounds and procedures for Guinea's purported revocation of Axis's Operating Permit and seizing of its mining operations.

29.    This commercial dispute is capable of settlement by arbitration in the United States, as the Supreme Court has long recognized the "emphatic federal policy in favor of arbitral

---

[8] Exhibit B at 37 (signature of President Conde); Exhibit C at 89 (signature of President Conde).

dispute resolution," which "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

30.     Accordingly, there is an agreement to arbitrate disputes arising out of a defined legal relationship that are capable of settlement by arbitration in the United States in satisfaction of § 1605(a)(6).

### *Subsection (A) – Arbitration Takes Place in the United States*

31.     Article 219 of the Mining Code allows an aggrieved party to select one of three pre-approved fora to finally determine any dispute—Guinean courts, national arbitration, or international arbitration—and the other party has irrevocably submitted to that elected forum by its agreement to Article 219.[9]

32.      If an aggrieved party elects international arbitration, Article 219 does not specify a seat for the arbitration, but instead allows that party to choose the seat.

33.     "International" arbitration under Article 219 means an arbitration outside of Guinea. This option allows a mining investor to choose an independent non-Guinean forum in the event that its rights under the Mining Code are breached.

34.     By allowing an aggrieved party to choose an "international" seat outside of Guinea, Article 219 contemplates arbitration occurring in the United States.

35.     On July 10, 2025, Axis served an ad hoc Notice of Arbitration by bailiff on the Central Secretariat of the Presidency of the Republic of Guinea, the Minister of Mines and Geology of the Republic of Guinea, and the *Agent judiciaire de l'État* of the Republic of Guinea (being the State's official legal representative in judicial affairs).[10] In that Notice of Arbitration,

---

[9] Exhibit E, art. 219.
[10] Exhibit H, Confirmation of Service of the Notice of Arbitration on the Central Secretariat of the Presidency of the Republic of Guinea on July 10, 2025 [Original French and English Translation]; Exhibit I, Confirmation of Service of the Notice of Arbitration on the Minister of Mines and Geology of the Republic of Guinea on July 10, 2025

Axis selected New York as the seat, nominated its arbitrator (a U.S.-based individual), and proposed application of the CPR Rules before a three-person tribunal.[11]

36.     As stated in the Notice of Arbitration and per the CPR Rules, this arbitration commenced on the date of service: July 10, 2025.[12]

37.     This arbitration is therefore pending in the United States in satisfaction of § 1605(a)(6)(A).

38.     Even though Axis needs to only satisfy either subparagraph (A) or (B) in § 1605(a)(6), Axis also satisfies subparagraph (B).

### *Subsection (B) – Alternatively, the Arbitration Agreement Is Governed by the New York Convention*

39.     In order for an arbitration agreement to "fall under" the New York Convention, it must satisfy 9 U.S.C. § 202, under which the agreement "(1) must arise out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993) (citing 9 U.S.C. § 202); *see also Pike v. Freeman*, 266 F.3d 78, 85 n.4 (2d Cir. 2001).

40.     Both the United States and Guinea are parties to the New York Convention,[13] and Article 219 of the Mining Code allows an aggrieved party to commence arbitration in a territory of a party to the Convention, providing options for Guinean arbitration or the choice of any seat of "international" arbitration, which includes signatories like the United States.

---

[Original French and English Translation]; Exhibit J, Confirmation of Service of the Notice of Arbitration on the *Agent judiciaire de l'État* of the Republic of Guinea on July 10, 2025 [Original French and English Translation].
[11] Exhibit G, ¶¶ 69-75.4.
[12] *Id.* ¶ 71.
[13] *Status: Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958) (the "New York Convention")*, United Nations Comm'n on Int'l Trade Law, https://uncitral.un.org/en/texts/arbitration/conventions/foreign_arbitral_awards/status2 (last visited August 19, 2025).

41.     "Two parties share a legal relationship within the meaning of the New York Convention if there is an agreement, whether contractual or not, that (1) 'explicitly contemplate[s] which parties it w[ill] obligate'; (2) determines 'the extent of the obligations'; and (3) provides 'the legal framework to govern the arrangement.'" *Zhongshan Fucheng Indus. Inv. Co. LTD v. Fed. Republic of Nigeria*, 112 F.4th 1054, 1062 (D.C. Cir. 2024) (alterations in original).

42.     The arbitration agreement at issue here arises out of a legal relationship because, as explained in paragraphs 61-66 and 74-85 below, both the Operating Permit and the Mining Code define and govern the obligations of Axis and Guinea, and Article 219 of the Mining Code allows Guinea to arbitrate disputes over its rights under the Operating Permit and Mining Code.[14]

43.     The definition of a "commercial" relationship under § 202 by its terms incorporates the definition of "involving commerce" under 9 U.S.C. § 2, which the Supreme Court has held includes the "broadest permissible" definition of commerce and "encompasses a wider range of transactions than those actually 'in commerce.'" *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). Thus, the award of contracts by governments to investors is commercial. *Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y.) (building and operating an industrial park), *aff'd*, 489 F.2d 1313 (2d Cir. 1973).

44.     Under this broad definition, the Parties' legal relationship is commercial in nature because, under Article 28 of the Mining Code, the Operating Permit granted Axis "the exclusive right of reconnaissance, prospecting, operation and free disposal of the mining substances for which it is issued, within the limits of its area and without limitation as to depth,"[15] and in

---

[14] *See also* Exhibit A; Exhibit E.
[15] Exhibit E, art. 28.

exchange Axis would, among other things, pay Guinea certain specified fees, duties, royalties, and costs, and prefer Guinean workers in hiring.[16]

45.     A legal relationship is "not entirely domestic in scope" when the arbitration agreement "did not simply arise 'out of [a legal] relationship which is entirely between citizens of the United States.'" *Pike*, 266 F.3d at 85 n.4.

46.     The legal relationship here is not entirely domestic in scope because it is between a foreign corporation and the Republic of Guinea, neither of which are citizens of the United States, and concerns the mining of bauxite in Guinea.

47.     The arbitration agreement is, therefore, governed by the New York Convention, an international agreement in force in the United States calling for the recognition and enforcement of arbitral awards, in satisfaction of § 1605(a)(6)(B).

**B.    Personal Jurisdiction**

48.     Under 28 U.S.C. § 1330(b), "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction under [one of the FSIA's exceptions] where service has been made under section 1608 of this title." This provision does "not require 'minimum contacts' over and above the contacts already required by the [FSIA's] enumerated exceptions to foreign sovereign immunity." *Antrix*, 145 S. Ct. at 1579; *see also Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021) (holding "a court may exercise personal jurisdiction over a foreign sovereign without regard to minimum contacts" under due process).

49.     As explained in paragraphs 13-47 above, there is subject-matter jurisdiction under the FSIA's arbitration exception.

---

[16] Exhibit A, arts. 10-11.

50.     28 U.S.C. § 1608(a) provides four methods of service on a foreign state "in hierarchical order," meaning service by the second method is only possible if the first method is not applicable, and so on. *See Republic of Sudan v. Harrison*, 587 U.S. 1, 4 (2019).

51.     Service under § 1608(a)(1) is inapplicable because Guinea has not entered into "any special arrangement for service" with Axis.[17]

52.     Service under § 1608(a)(2) is inapplicable because Guinea is not a party to an "applicable international convention on service of judicial documents," such as the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. *See, e.g., Compagnie Sahelienne d'Entreprise v. Republic of Guinea*, No. CV 20-1536 (TJK), 2021 WL 2417105 (D.D.C. June 14, 2021) (observing that Guinea "is not a party to any relevant international convention for the service of documents").

53.     Here, as in other cases, Axis will attempt service on Guinea in accordance with 28 U.S.C. § 1608(a)(3), which requires "a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, [to be] addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *See, e.g., Levy v. Republic of Guinea*, No. 19-CV-2405 (DLF), 2020 WL 3893019 (D.D.C. July 10, 2020) (holding certification of service on Guinea was effective after DHL delivery to head of ministry of foreign affairs).

54.     If service under § 1608(a)(3) is ineffective, Axis will resort to service under § 1608(a)(4), which provides:

> if service cannot be made within 30 days under paragraph (3), by sending two
> copies of the summons and complaint and a notice of suit, together with a
> translation of each into the official language of the foreign state, by any form of

---

[17] *See* Declaration of Vasundhara Oswal, ¶ 23.

mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

## C.    <u>Venue</u>

55.    9 U.S.C. § 204, governing actions to compel arbitration under the New York Convention, provides:

An action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States.

56.    Venue is proper under § 204 because this district contains a place designated in the arbitration agreement as the place of arbitration by virtue of Article 219 of the Mining Code, which authorizes Axis as the aggrieved party to select New York City as the seat for international arbitration.[18]

57.    Venue is also proper under 28 U.S.C. § 1391(f), the general venue provision for actions against foreign sovereigns, because a substantial part of the events or omissions giving rise to the claim arose in this district. Axis has commenced an ad hoc arbitration before a three-person international arbitral tribunal in this district and has proposed the use of both a U.S.-based arbitrator and rules promulgated by the New York City-based entity CPR.[19] Further, upon information and belief, the revenues to be paid and payable in connection with the mining operations in issue are denominated in U.S. dollars, as are fines and penalties under the Mining

---

[18] Exhibit E, art. 219.
[19] Exhibit G, ¶¶ 69-75.4.

Code, and any distribution of funds in resolution or settlement of this action will also likely be settled through dollar trades in this district.[20]

## BACKGROUND

### A.    Initial Prospecting Activities

58.    On September 2, 2013, pursuant to Order No. A/2013/4539/MMG/SGG, Axis received bauxite prospecting permits ("Prospecting Permits") permitting it to undertake exploration activities on certain plateaus in the western part of the Republic of Guinea.[21]

59.    The Prospecting Permit was renewed on August 29, 2016, by Order No. A2016/4063/MMG/SGG after retrocession of the initial area.

60.    In the following years, Axis pursued the prospecting activities and other preparatory activities to determine the feasibility of the establishment of a mining operation within the Prospecting Area, including but not limited to:

- drilling holes across the plateaus within the Prospecting Area to collect and analyze samples;

- constructing of a 30 kilometer road from the Koniokhoure plateau to a jetty at Bobo;

- completing a study on environmental and social impacts;

- undertaking pre-feasibility studies;

- conducting bathymetry on the Fatala River; and

- undertaking road topography and geotechnics in the port area.[22]

---

[20] *See for example* Exhibit A, arts. 5, 11 (stating Axis's mining budget in U.S. dollars and providing for certain payments in U.S. dollars).
[21] *See* Declaration of Vasundhara Oswal, ¶ 6
[22] *Id.*

**B.**    **Award of Axis's Operating Permit**

61.    On October 13, 2017, after consideration of a detailed feasibility study and other material provided by Axis in accordance with Article 30 – II of the Mining Code, the General Manager of the National Service for Coordination of Mining Projects wrote to the Minister of Mines and Geology to communicate that the Technical Committee, which was responsible for validating feasibility studies, recommended that Axis be awarded an Operating Permit.[23]

62.    Accordingly, on November 2, 2018, the then-President of Guinea, Professor Alpha Condé, issued Decree D/2018/267/PRG/SGG (previously defined as the "Operating Permit"), which awarded to Axis "one (1) industrial mining operating permit for Bauxite, covering an area of 425.36 km$^2$" identified by map and coordinates ("Exploitation Area").[24]

63.    Operating Permit is defined in Article 1 of the Mining Code as follows:

Industrial or Semi-industrial Mining Operating Permit (Permis d'exploitation minière, industrielle ou semi industrielle): Mining Title relating to an area defined by geographic coordinates, granted by decree of the President of the Republic, conferring upon its holder the exclusive right to search, Prospect, operate and freely dispose of the Mining Substances for which it is issued, within a specified area and without limitation as to depth.[25]

64.    By virtue of Article 28 of the Mining Code, Axis's Operating Permit conferred on it "the exclusive right of reconnaissance, prospecting, operation and free disposal of the mining substances for which it is issued, within the limits of its area and without limitation as to

---

[23] Exhibit K, Letter from the General Manager, National Service for Coordination of Mining Projects, Ministry of Mines and Geology [*Service National de Coordination des Projets Miniers*] to the Minister of Mines and Geology, dated October 13, 2017, with Mail Circulation Sheet [*Fiche de circulation du courrier*], dated October 17, 2017 [Original French version and English translation].

[24] Exhibit A, arts. 1, 4.

[25] Exhibit E, art. 1. Within the taxonomy of the Mining Code, rights conferred are divided into Mining Titles and Authorisations. Mining Title is a term that encompasses both operating permits and mining concessions. Operating permits are themselves further divided into industrial mining operating permits and semi-industrial mining operating permits. The Operating Permit granted to Axis was an industrial mining operating permit. Authorisations are a different form of permit which principally concern staking, exploration and operating rights in relation to quarry substances (as opposed to minerals).

depth."[26] Pursuant to Article 28, Axis's Operating Permit was a "moveable, divisible and leaseable right."[27]

65.     Under Article 32 of the Mining Code, the term of the industrial operating permit awarded was fifteen years and was renewable in accordance with Article 33 of the Mining Code,[28] which was reiterated in Article 2 of the Operating Permit.[29] Article 33 of the Mining Code further specifies the process for renewal of the permit:

> The term of an Industrial or Semi-industrial Operating Permit shall be renewed several times, at the request of its holder and under the same conditions as for the award of the Permit, each time for a period of not more than five years, when the holder has met its obligations stipulated upon the issue or renewal of the Title and those arising under this Code, its implementing regulations and the terms of reference, or the Mining Agreement.[30]

66.     Accordingly, Axis's Operating Permit had a primary term of validity until November 1, 2033, which was then renewable for five-year periods. Axis had every intention of applying for an extension at the appropriate time, and expected to be fully compliant with its obligations and therefore to obtain a renewal of Axis's Operating Permit in accordance with Article 33.

**C.     Establishment of Mining Operations**

67.     On March 29, 2019, Axis entered into an agreement ("Farmout Agreement") with Alliance Guinéenne de Bauxite d'Alumine et D'Aluminium SA ("AGB2A") under which AGB2A undertook to carry out development work and perform mining activities in the Exploitation Area, in exchange for a royalty. The government approved the Farmout Agreement prior to it being signed. (On May 28, 2019, the then-Minister of Mines, Mr. Abdoulaye

---

[26] *Id.* art. 28.
[27] *Id.*
[28] *Id.* arts. 32-33.
[29] Exhibit A, art. 2.
[30] Exhibit E, art. 33.

Magassouba, wrote to the General Manager of Axis to communicate Guinea's approval of the Farmout Agreement pursuant to Article 90 of the Mining Code.[31])

68.    The development work carried out in the permit area included construction and commissioning of infrastructure and installations for mining the deposit, logistics and transportation activities, delineation drilling, construction of roads, a railway line and a port, stripping of waste rock, communications infrastructures and electrical installations for the development of the deposit. The royalty was fixed initially at 1 USD per dry ton of bauxite exported but was later increased to 2 USD per dry ton exported, pursuant to an Addendum to the Farmout Agreement, which was executed on September 8, 2022.[32]

69.    Since 2020, extensive development works have been undertaken and the mining operations established inside the Exploitation Area have been producing and exporting bauxite ore in increasing quantities. This has included a beneficiation plant, a bridge (approximately 350 meters in length), and a mining road (approximately 75 kilometers in length). In the weeks preceding the suspension of operations due to the issuance of the May 14 Decree, Axis's mining operation was producing an average of 169,138 metric tons per day.

**D.    The May 14 Decree and Guinea's Withdrawal  of Axis's Operating Permit**

70.    On May 14, 2025, the President of Guinea issued a decree titled "Decree D/2025/0067/PRG/CNRD/SGG on the Withdrawal of Mining Concessions, Industrial Operating Permits and Semi-Industrial Operating Permits Granted to Companies," pursuant to which Guinea purported to revoke 51 mining titles, including Axis's Operating Permit, listed in a table under Article 1 of the May 14 Decree.[33]

---

[31] Exhibit L, Letter from the Minister of Mines and Geology to the General Manager of Axis Minerals Resources S.A. [Original French version and English translation].
[32] *See* Declaration of Vasundhara Oswal, ¶ 6.
[33] Exhibit F.

71.    The May 14 Decree was announced on national television on the evening of May 14, 2025.[34]

72.    On May 15, 2025, the Directorate-General of the National Police issued a Circular Note to the Regional Police Directors, Central Commissioners, and Special Commissioners for Mines and Quarries (the "Closure Order") in execution of the May 14 Decree.[35]

73.    Following issue of the Closure Order, the Guinean police attended Axis's mining operation and enforced a compulsory suspension of all mining operations located in the Exploitation Area. All machinery at Axis's mining operation was seized, and all personnel were instructed to vacate the site immediately. Axis understands that the Guinean police continue to monitor the Exploitation Area and are not allowing any resumption of mining operations. Consequently, Axis's mining operation has been suspended since this time.[36]

**E.    Guinea's Breaches of the Mining Code**

74.    The May 14 Decree stated it was revoking operating permits pursuant to Articles 3, 34, 77, 82, 88, and 89 et seq. of the Mining Code and Article 71 of Decree D/2014/012/PRG/SGG of January 17, 2014, on the Management of Mining Authorisations and Rights ("Mining Management Decree").[37]

75.    No formal notice was issued by Guinea, nor did Guinea specify any ground for withdrawal of Axis's Operating Permit that was applicable to Axis.[38] Further, despite immediate and repeated requests for an explanation, as detailed in paragraphs 86-99 below, it remains the case that no explanation has been provided to Axis for the revocation of Axis's Operating Permit

---

[34] Exhibit M, Recording of televised announcement of Decree D/2025/0067/PRG/CNRD/SGG [Unofficial transcript in French and English translation], Video accessible at <https://www.dailymotion.com/video/x9jjbju>
[35] Exhibit N, Circular Note issued to the Regional Police Directors, Central Commissioners, and Special Commissioners for Mines and Quarries, dated May 15, 2025 [Original French version and translation].
[36] *See* Declaration of Vasundhara Oswal, ¶ 14.
[37] Exhibit F, art. 1.
[38] *See* Declaration of Vasundhara Oswal, ¶ 12.

pursuant to the May 14 Decree. None of Articles 3, 34, 77, 82, 88, and 89 et seq. of the Mining Code and Article 71 of Decree provide a basis for the withdrawal, and these are addressed in turn below.

76.     While Article 3 of the Mining Code provides a general prohibition on the private appropriation of "Mineral Substances", this general prohibition is subject to a qualification that permits private appropriation of Mineral Substances as provided for in the Mining Code itself.[39] Article 3 also acknowledges expressly that holders of Mining Titles for the use of mining or quarry substances, such as Axis, acquire ownership over extracted substances and hold rights of ownership to the substance, distinct from the ownership of the surface.

77.     Accordingly, there is nothing in Article 3 itself that provides an independent basis or legal grounds for the revocation of Axis's Operating Permit pursuant to the May 14 Decree.

78.     Article 34 of the Mining Code places obligations, inter alia, on the holder of an Operating Permit to "commence development works within a maximum period of one year as from the date of issue of the Permit", failing which "the holder shall be liable to a penalty for delay of 100,000 USD per month for the first three months".[40] If, after 18 months from the date of the award the holder has still not started work, "the State reserves the right to revoke or cancel the Title"

79.     As detailed in paragraphs 67-69 above, development work began in 2019 (within a year of the award of Axis's Operating Permit on November 2, 2018) and the site has been producing bauxite ore from 2020 in increasing quantities. Accordingly, Article 34 has been met by Axis, and it does not provide a basis for the revocation of Axis's Operating Permit.

---

[39] Exhibit E, art. 3.
[40] *Id.* art. 34.

80.    Article 77 of the Mining Code provides that applications for renewal of Prospecting Permits, Operating Permits and Mining Concessions must be submitted "not less than three months for a Prospecting Permit or six months for an Operating Permit or Mining Concession, prior to the end of the current term of the Mining Title."[41] Relatedly, Article 82 of the Mining Code provides that a Mining Title or Authorization "shall expire at the end of the period for which it was awarded", after which "the rights conferred on its holder shall revert to the State free of charge."[42]

81.    As noted in paragraphs 65-66 above, the current term of Axis's Operating Permit ends on November 1, 2033, and therefore Articles 77 and 82 can have no application to Axis's Operating Permit nor do they provide grounds for the 14 May Decree.

82.    Article 88 of the Mining Code provides a list of specific grounds on which Mining Titles and Authorisations issued pursuant to the Mining Code "may be revoked by the issuing authority."[43] Relatedly, Article 71 of the Mining Management Decree describes certain situations in which withdrawal of an industrial or semi-industrial operating permit or mining concession may be revoked.[44]

83.    However, importantly, Article 88 of the Mining Code prescribes a specific procedure for revocation which must be followed:

> Revocation may only occur after formal notice sent by the Minister to the holder of the Mining Title or the Authorisation requesting the holder to provide, within the periods indicated below, proof of compliance with its obligations before the date of the formal notice:
>
> • One month for Prospecting Permits and Authorisations; and

---

[41] *Id.* art. 77.
[42] *Id.* art. 82.
[43] *Id.* art. 88.
[44] Exhibit O, Decree D/2014/012/PRG/SGG on the Management of Mining Authorisations and Rights [Official French version], art. 71; Exhibit P Certified English Translation of Relevant Management of Mining Authorisations and Rights Decree provisions, art. 71.

- Forty-five days for the Operating Permit and Mining Concession[45]

84.    A similar notice requirement is also found in Article 71 of the Mining Management Decree.[46]

Consequently, the May 14 Decree is unlawful and/or invalid, and has been issued without proper basis.

85.    Additionally, by reason of the enforced suspension of operations carried out by the Guinean police pursuant to the May 14 Decree and/or the Closure Order issued by the Directorate-General of the National Police, Axis was deprived of its rights guaranteed by Articles 15 and 95 of the Mining Code to dispose freely of its property and organize its enterprise, freedom of circulation for its personnel and products within the Republic of Guinea, and dispose of products on international markets and to export and dispose of products on foreign markets.[47]

**F.    Failure of Amicable Settlement and Commencement of Arbitration**

86.    In the days following the May 14 Decree, Axis wrote repeatedly to the Ministry of Mines and Geology to request additional details and challenge the unlawful withdrawal of Axis's Operating Permit and Guinea's subsequent conduct in execution of the May 14 Decree.

87.    Specifically, on May 19, 2025, Axis wrote to the Ministry of Mines and Geology "to request detailed information about the withdrawal" of Axis's Operating Permit and stated:

> We are particularly surprised to see Axis included in this list, especially as it has not received any prior formal notice to comply with any legal requirements or the financial requirements with which we are in full compliance as the holder of the operating licence. According to the general principles of law, the withdrawal of a licence should be preceded by a formal notice, that goes unheeded, allowing a reasonable length of time. This doesn't seem to have been the case here, which comes as a great surprise to us, as we've been operating in Guinea since 2013.

---

[45] Exhibit E, art. 88.
[46] Exhibit P, art. 71.
[47] Exhibit E, arts. 15, 95.

We would also like to express our willingness to promote constructive dialogue with a view to working together on possible ways of re-establishing our good relations, in strict compliance with the legislative, environmental and social framework in force.

We would be grateful if you could provide us with the precise reasons for this decision, as well as any conditions under which negotiations could be initiated. We hold a mining licence and were forced to cease our activities as a result of this surprising decree, which was imposed on us without prior notice. . . .[48]

88.    No response was received to this correspondence.[49]

89.    Subsequently, on May 26, 2025, Axis again wrote to the Ministry of Mines and Geology following issue of the Closure Order and the enforced suspension of Axis's mining operation and stated:

With the greatest respect for the authority of your departments, we would like to point out that the mine run by Axis was in full operation, in accordance with its Granting Decree, and that Axis did not commit any of the offences referred to in the Withdrawal Decree, in particular with regard to:

- failure to start work within the required timeframe,

- discontinuation of mining activities,

- or any other substantial breach of the obligations associated with the licence.

In these circumstances, the Closure Order for the Axis mine has no legal basis and constitutes a clear violation of our company's acquired rights, as well as an unjustified attack on the legal security of investments.

Consequently, we have the honour of respectfully requesting from your high authority the withdrawal, within 72 hours of the aforementioned Closure Order, as well as written confirmation of the immediate lifting of any measure suspending or interrupting the activities of Axis."[50]

---

[48] Exhibit Q, Letter from Axis Minerals Resources SA to the Minister of Mines and Geology, dated May 19, 2025 [Original French version and English translation]
[49] *See* Declaration of Vasundhara Oswal, ¶ 16.
[50] Exhibit R, Letter from Axis Minerals Resources SA to the Minister of Mines and Geology, dated May 26, 2025 [Original French version and English translation]

90.    Axis received confirmation (in the form of copies stamped with acknowledgements of receipt) that the May 26, 2025 letter had been received by no later than May 27, 2025.[51] This correspondence also went without any response.[52]

91.    Additionally, Axis has made repeated attempts to meet with officials from the Ministry of Mines and Geology, and more generally officials of Guinea, to try to address the unlawful actions of Guinea. All these attempts have been in vain. Guinea has refused all meetings and has provided no explanation for its actions.

92.    On June 12, 2025, Axis wrote to Guinea setting out Axis's position as to why withdrawal of Axis's mining rights was unlawful and extended an invitation to initiate amicable settlement under Article 219 of the Mining Code and requesting a response.[53] The letter stated that, if Axis did not receive a response within fifteen days, Axis intended to pursue its rights to bring further proceedings under Article 219.

93.    Axis received confirmation (in the form of copies stamped with acknowledgements of receipt) that the June 12, 2025 letter had been received by no later than June 13, 2025, by both the Central Secretariat of the Presidency of the Republic of Guinea and the Ministry of Mines and Geology.[54] Axis has received no response.[55]

94.    On July 3, 2025, Axis sent an additional letter to Guinea noting Guinea had failed to respond, and that if Guinea did not immediately respond, Axis would consider amicable

---

[51] *Id.*
[52] *See* Declaration of Vasundhara Oswal, ¶ 18.
[53] Exhibit S, Letter from Jones Day to the Republic of Guinea, dated June 12, 2025 (with Acknowledgment of Receipt from Presidency) [English and French translation]; Exhibit T, Letter from Jones Day to the Republic of Guinea, dated June 12 2025 (with Acknowledgment of Receipt from Ministry of Mines and Geology) [English and French translation].
[54] Exhibit S; Exhibit T.
[55] *See* Declaration of Vasundhara Oswal, ¶ 20; Declaration of Mikaël Schinazi, ¶ 11.

settlement as having failed and would pursue its rights to bring further proceedings under Article 219.[56]

94.    Axis received confirmation (in the form of copies stamped with acknowledgements of receipt) that the July 3, 2025 letter was received that day by each of the Central Secretariat of the Presidency of the Republic of Guinea; the Head of the Ministry of Foreign Affairs, African Integration, and Guineans Living Abroad; and the Ministry of Mines and Geology.[57] Axis has received no response.[58]

96.    After Axis received no response, on July 10, 2025, Axis exercised its rights under Operating Permit and Mining Code and served Guinea with the Notice of Arbitration, which commenced an ad hoc international arbitration in New York City, proposing application of the CPR Rules before a three-person tribunal.[59]

97.    Pursuant to Article 89 of the Mining Code, this challenge to Guinea's purported revocation initiated within sixty days of such purported revocation suspended execution thereof.[60]

98.    On August 11, 2025, Axis sent a further letter to Guinea noting Guinea had failed to respond to Axis's Notice of Arbitration and appoint an arbitrator within the thirty days

---

[56] Exhibit U, Letter from Jones Day to the Republic of Guinea, dated July 3, 2025 (with Acknowledgment of Receipt from Presidency) [English and French translation]; Exhibit V, Letter from Jones Day to the Republic of Guinea, dated July 3, 2025 (with Acknowledgment of Receipt from Ministry of Foreign Affairs, African Integration and Guineans Living Abroad) [English and French translation]; Exhibit W, Letter from Jones Day to the Republic of Guinea, dated July 3, 2025 (with Acknowledgment of Receipt from Ministry of Mines and Geology) [English and French translation].
[57] Exhibit U; Exhibit V; Exhibit W.
[58] *See* Declaration of Vasundhara Oswal, ¶ 20; Declaration of Mikaël Schinazi, ¶ 15.
[59] Exhibit G, ¶¶ 69-75.4.
[60] Exhibit E, art. 89.

required under the CPR Rules and stating that, if Guinea did not do so by August 18, 2025, Axis would seek an order compelling arbitration from this Court, without any further notice.[61]

99.     Axis received confirmation (in the form of copies stamped with acknowledgements of receipt) that the August 11, 2025 letter was received on August 13, 2025 by each of the Central Secretariat of the Presidency of the Republic of Guinea, the Ministry of Mines and Geology, and the *Agent judiciaire de l'État* of the Republic of Guinea, and on August 14, 2025 by the Ministry of Foreign Affairs, African Integration and Guineans Living Abroad.[62] Axis has received no response.[63]

## ARGUMENT

100.     The Court should compel arbitration under chapter 2 of FAA governing enforcement of arbitration under the New York Convention and/or chapter 1 of the FAA governing enforcement of arbitration provisions in general.

101.     Chapter 1, 9 U.S.C. § 4, provides, "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." In analyzing a petition to compel arbitration, a court must determine (1) "whether a valid agreement or obligation to arbitrate exists," and (2) "whether one party to the agreement has failed, neglected or refused to arbitrate." *Shaw Group Inc. v. TripleFine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003). Once the party seeking to compel arbitration shows an agreement exists,

---

[61] Exhibit X, Letter from Jones Day to the Republic of Guinea, dated August 11, 2025 (with Acknowledgment of Receipt from Presidency) [English and French translation]; Exhibit Y, Letter from Jones Day to the Republic of Guinea, dated August 11, 2025 (with Acknowledgment of Receipt from Ministry of Mines and Geology) [English and French translation]; Exhibit Z, Letter from Jones Day to the Republic of Guinea, dated August 11, 2025 (with Acknowledgment of Receipt from Ministry of Foreign Affairs, African Integration and Guineans Living Abroad) [English and French translation]; Exhibit AA, Letter from Jones Day to the Republic of Guinea, dated August 11, 2025 (with Acknowledgment of Receipt from *Agent judiciaire de l'État*) [English and French translation].
[62] Exhibit X; Exhibit Y; Exhibit Z; Exhibit AA.
[63] *See* Declaration of Vasundhara Oswal, ¶ 22; Declaration of Mikaël Schinazi, ¶ 26.

the burden shifts to the party resisting arbitration to show it is invalid. *Aminoff & Co. LLC v. Parcel Pro, Inc.*, No. 21CV10377ATKHP, 2022 WL 987665, at *3 (S.D.N.Y. Apr. 1, 2022).

102.    Chapter 2, 9 U.S.C. § 206, provides that, when a court has jurisdiction to enforce an agreement under the New York Convention, the court should "direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." Once there is an agreement governed by the New York Convention, the court "must order arbitration unless it finds the agreement 'null and void, inoperative or incapable of being performed.'" *Cargill Int'l*, 991 F.2d at 1018. The party resisting arbitration bears the burden of proof as to any defense asserted under the New York Convention. *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974); *SSI (Beijing) Co. Ltd. v. Prosper Bus. Dev. Corp.*, No. 18CV8408VECBCM, 2020 WL 6323938, at *9 (S.D.N.Y. July 30, 2020), *report and recommendation adopted*, No. 18-CV-8408 (VEC), 2020 WL 5253515 (S.D.N.Y. Sept. 3, 2020).

103.    This is a well-worn path, and courts regularly compel arbitration in similar terms to the relief sought here. *See, e.g.*, *Cargill*, *Int'l*, 991 F.2d at 1018; *Vitol, Inc. v. Copape Produtos de Petroleo Ltda.*, No. 22 CIV. 10569 (JPC), 2024 WL 1216660, at *14 (S.D.N.Y. Mar. 21, 2024); *CKR L. LLP v. Anderson Invs. Int'l, LLC*, 544 F. Supp. 3d 474, 477 (S.D.N.Y. 2021); *Travelport Glob. Distribution Sys. B.V. v. Bellview Airlines Ltd.*, No. 12 CIV. 3483 DLC, 2012 WL 3925856, at *8 (S.D.N.Y. Sept. 10, 2012).

A.    **There Is a Valid Agreement to Arbitrate**

104.    An arbitration agreement need only show "that the parties clearly intended to submit some disputes to their 'chosen instrument for the definitive settlement of [certain] grievances under the [a]greement.'" *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*,

858 F.2d 825, 830 (2d Cir. 1988). The agreement need not specify "procedural rules" or "specify

who shall be the arbitrator of disputes." *Badinelli v. Tuxedo Club*, 183 F. Supp. 3d 450, 455

(S.D.N.Y. 2016); *see also Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 150 (2d Cir. 2004)

(upholding an arbitration clause even when procedural rules were lacking in the underlying

agreement); 9 U.S.C. § 5 (allowing the court to appoint an arbitrator if one is not specified).

105.    The Parties formed an arbitration agreement in two ways.

106.    First, the Operating Permit, signed and agreed to by the Guinean president, is

specifically made "having regard to" Law L/2011/006/CNT of September 9, 2011, on the Mining

Code of the Republic of Guinea, as amended by Law L/2013/053/CNT of April 8, 2013, *i.e.*, the

Mining Code, and thus incorporates its provisions.[64] *See Pagaduan*, 709 F. App'x at 715 (finding

a contract incorporated a document containing an arbitration provision when the contract was

made "in accordance with" the referenced document).

107.    By incorporating the Mining Code, Guinea agreed to the arbitration provision of

Article 219, which clearly provides that a "dispute shall be submitted . . . [to] international

arbitration."[65]

108.    Second, Article 219 of the Mining Code "constitutes a standing offer to arbitrate

disputes" with mining investors. *Olin Holdings*, 73 F.4th at 102.

109.    Guinea agreed to the provisions of the Mining Code by the legislature's passage

of the Code and the President's signing it into law, including Article 219's offer of arbitration.[66]

110.    In either case, Axis agreed to and availed itself of this arbitration provision by

sending signed letters seeking amicable settlement with Guinea and, after such settlement failed,

---

[64] Exhibit A, at 1.
[65] Exhibit E, art. 219.
[66] Exhibit B at 37 (signature of President Conde); Exhibit C at 89 (signature of President Conde).

electing to arbitrate this dispute pursuant to Article 219 of the Mining Code in its Notice of Arbitration.[67]

111.    Guinea's issuance of the Operating Permit incorporating the Mining Code and/or its standing offer to arbitrate under Article 219, combined with Axis's acceptance of the Operating Permit and/or its aforementioned letters and Notice of Arbitration, constitute a written agreement to submit disputes to international arbitration. *See* N.Y. Convention art. 2(2); 9 U.S.C. § 2; *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) (stating this process "formed an 'agreement in writing' within the meaning of the New York Convention").

112.    Further, Axis is a mining investor as specified in Article 219, which includes entities that are authorized to conduct mining activity in Guinea, including holders of Permits, Authorisations and Concessions. Prior to Axis Minerals holding an Operating Permit, it held a Prospecting Permit. As explained in paragraphs 58-69 above, for over a decade Axis Minerals has made pecuniary and nonpecuniary investments in Guinea, through all phases of the mining cycle, including prospecting, exploration and extraction.

113.    The present dispute falls within the type of disputes Article 219 provides may be submitted to arbitration because, as explained in paragraphs 70-85 above, it concerns Axis's rights under the Operating Permit and the Mining Code, including with respect to the grounds and procedures for the purported revocation of  Axis's Operating Permit and the improper seizure of its mining operations.

114.    Because this arbitration agreement falls under the New York Convention as explained in paragraphs 39-47 above, the Court should enforce this valid arbitration agreement

---

[67] Exhibit G; Exhibit S; Exhibit T; Exhibit U; Exhibit V; Exhibit W.

pursuant to § 206 in chapter 2 of the FAA governing enforcement of arbitration under the New York Convention.

115.    Nevertheless, this written arbitration agreement is also valid under 9 U.S.C. § 2 and subject to enforcement under § 4 in chapter 1 of the FAA because Guinea has refused to arbitrate.

**B.    Guinea Has Refused to Arbitrate**

116.    A party fails, neglects, or refuses to arbitrate under § 4 when it has "unambiguously manifest[ed] an intention to not arbitrate." *LAIF X SPRL v. Axtel*, 390 F.3d 194, 198 (2d Cir. 2004).

117.    Axis repeatedly attempted to amicably resolve this dispute with Guinea in accordance with Article 219, including by sending a letters on May 19, 2025; May 26, 2025; June 12, 2025; July 3, 2025, and August 11, 2025.[68] Axis has received no response.

118.    Similarly, Guinea has rejected Axis's other attempts to meet with officials without explanation.

119.    After these attempts at amicable resolution failed, Axis filed a Notice of Arbitration commencing arbitration on July 10, 2025, in New York, NY, and proposing application of the CPR Rules—standard rules used in complex international arbitrations.[69]

120.    Axis received confirmation that this Notice of Arbitration was served by bailiff on July 10, 2025, on the Central Secretariat of the Presidency of the Republic of Guinea, the Minister of Mines and Geology of the Republic of Guinea, and the *Agent judiciaire de l'État* of the Republic of Guinea.[70] This notice stated that, in accordance with the CPR Rules, "Within 30

---

[68] Exhibit Q; Exhibit R; Exhibit S; Exhibit T; Exhibit U; Exhibit V; Exhibit W; Exhibit X.
[69] Exhibit G.
[70] Exhibit H; Exhibit I; Exhibit J.

days of the date of receipt of this Notice of this Arbitration, the Respondent is hereby required, in writing, to serve a Notice of Defense to this Notice of Arbitration."[71]

121.    Guinea has manifested its intent not to arbitrate by not responding within the prescribed thirty days since service, nor at any other time, despite having been validly served and having notice of the arbitration. Guinea further manifested its intent not to arbitrate by continuing its nonresponse despite having been served with a letter on August 13 and 14, 2025, stating that Axis would seek an order from this Court compelling arbitration if Guinea did not respond by August 18, 2025.[72]

122.    Therefore, Axis is entitled to an order compelling Guinea to arbitrate this dispute under § 4 of chapter 1 of the FAA.

## C.    **The Court Should Order Arbitration and Appoint Arbitrators as Axis Has Proposed**

123.    9 U.S.C. § 206 permits a court compelling arbitration under the New York Convention to "direct that arbitration be held in accordance with the agreement at any place therein provided for" and to "appoint arbitrators in accordance with the provisions of the agreement."

124.    Article 219 of the Mining Code allows an aggrieved party to select one of three pre-approved fora to finally determine any dispute, and the other party has irrevocably submitted to that elected forum by means of Article 219.[73]

---

[71] Exhibit G, ¶ 74.
[72] Exhibit X; Exhibit Y; Exhibit Z; Exhibit AA.
[73] Exhibit E, art. 219.

125.    For international arbitration, in particular, Article 219 does not specify a specific seat, number of arbitrators or method of appointment, but instead allows the aggrieved party to choose.

126.    Axis has exercised its rights under the Mining Code and proposed that the dispute be finally determined by an ad hoc three-person international arbitral tribunal in New York under the CPR Rules, composed of (1) O. Thomas Johnson, Jr.,[74] as appointed by Axis in its Notice of Arbitration, (2) a second arbitrator appointed by Guinea or by CPR on behalf of Guinea, should Guinea fail to answer, and (3) a third arbitrator selected by the first two—or, if they cannot agree, by the CPR—who shall serve as chair.[75]

127.    Because the Mining Code allows the aggrieved party to commence an international arbitration and choose a seat, and Axis has done so, the Court should order arbitration in the format selected by Axis given that Axis has made that selection "in accordance with" the agreement. § 206.

128.    Alternatively, because the agreement does not specify a seat for arbitration, the Court may order arbitration within this district under 9 U.S.C. § 4. *Oil Basins Ltd. v. Broken Hill Proprietary Co.*, 613 F. Supp. 483, 488 (S.D.N.Y. 1985) (ordering arbitration within the district in a case falling under the New York Convention); *Jain v. de Mere*, 51 F.3d 686, 690 (7th Cir. 1995) (same).  And because Article 219 does not specify an arbitrator, the court may appoint an arbitrator under 9 U.S.C. § 5 in a manner the Court chooses. *See Jain*, 51 F.3d at 691. These

---

[74] Mr. Johnson is a well-regarded figure in international arbitration. He has held several academic appointments, publications in leading journals and currently lectures at Columbia Law School, teaching a course on the international law protecting foreign investments. He is also a member of the Iran-United States Claims Tribunal, a former member of the International Centre for Settlement of Investment Disputes Panel of Arbitrators, and the State Department (Office of the Legal Adviser). He has extensive experience in representing parties in international arbitrations and was a Partner of Covington & Burling LLP in Washington DC for over 30 years.
[75] Exhibit G, ¶¶ 73–75.4.

provisions apply to arbitration agreements enforced under both chapter 1 or chapter 2 of the FAA. *See, e.g.*, *Oil Basins*, 613 F. Supp. at 488; *Jain*, 51 F.3d at 690-91.

129.    Axis's proposed arbitration seat and choice of arbitration rules constitute a reasonable proposal, which the Court should adopt. *See CKR L.*, 544 F. Supp. 3d at 484.

## REQUEST FOR RELIEF

WHEREFORE, Petitioner Axis respectfully requests the Court enter the following relief:

 i. Issuance of an order, pursuant to 9 U.S.C. § 206 and the arbitration provision in Article 219 of the Mining Code agreed to by the Parties, compelling Guinea to arbitrate before the following ad hoc three-person international arbitral tribunal in New York under the CPR Rules in the manner Axis has proposed/selected, as envisaged and permitted by Article 219 and as irrevocably submitted to by Guinea:

  a. O. Thomas Johnson, Jr., as selected by Axis in its notice of arbitration;

  b. A second arbitrator appointed by CPR on behalf of Guinea, who failed to answer; and

  c. A third arbitrator selected by the first two—or, if they cannot agree, selected by the CPR—who shall serve as chair.

 ii. Alternatively, issuance of an order pursuant to 9 U.S.C. §§ 4 and 5 compelling arbitration in this district and appointing an arbitrator, either in the manner that Axis has proposed/selected or in a manner the Court may direct.

 iii. Awarding Axis such other and further relief as the Court deems just and proper

Dated: August 19, 2025
      New York, New York

JONES DAY


By:  /s/ Stephen J. Pearson

      Stephen J. Pearson
      Brandon M. Sprague
      250 Vesey Street
      New York, NY  10281.1047
      Telephone:  +1.212.326.3939
      Facsimile:  +1.212.755.7306
      sjpearson@jonesday.com
      bsprague@jonesday.com

Attorneys for Petitioner Axis