# Exhibit G

---

### AXIS MINERALS RESOURCES SA

(a company incorporated under the laws of the Republic of
Guinea)

*Claimant*

and

### THE REPUBLIC OF GUINEA

*Respondent*

---

### NOTICE OF ARBITRATION

---

### 10 JULY 2025

JONES DAY

250 Vesey Street, New York, New York 10281-1047, United States of America

21 Tudor Street, London EC4Y 0DJ, United Kingdom

Counsel for the Claimant

The English version of this Notice of Arbitration is authoritative; a version has been prepared in French and is provided as a courtesy.[1] Both English and French versions of this Notice of Arbitration have been served on the Respondent at each of the addresses listed in paragraph 8 below.

**A    Executive summary**

1.    This Notice of Arbitration is issued on behalf of the Claimant, Axis Minerals Resources SA (the "**Claimant**" or "**Axis Minerals**"), against the Respondent, the Republic of Guinea (the "**Respondent**" or "**Guinea**"), pursuant to Article 219 of the 2011 Mining Code of the Republic of Guinea, as amended (the "**Mining Code**").[2]

2.    The dispute arises out of a Decree titled "*Decree D/2025/0067/PRG/CNRD/SGG on the Withdrawal of Mining Concessions, Industrial Operating Permits and Semi-Industrial Operating Permits Granted to Companies*" issued by the President of Guinea on May 14, 2025 ("**May 14 Decree**"),[3] pursuant to which the Respondent revoked and returned to Guinea the mining permit held by the Claimant, Axis Minerals ("**Claimant's Operating Permit**").[4] The May 14 Decree also purported to revoke 50 other mining permits issued to different companies.

3.    In order for Respondent to be able to revoke a mining permit, one or more of the grounds for revocation set out in Article 88 of the Mining Code must be satisfied, but the Claimant maintains no such grounds existed here, nor was the mandatory notice procedure also set out in Article 88 complied with (no prior notice period or cure period was given to the Claimant). Accordingly, the May 14 Decree was unlawful, invalid, and of no legal effect. It follows from this that all subsequent action taken by the Respondent to give effect to the May 14 Decree was also unlawful and constituted a violation of the Claimant's rights under the Mining Code and a breach of the general freedoms guaranteed to the Claimant under Article 95 of the Mining Code.

---

[1] Unless otherwise indicated, the English translations included in the Exhibit are not certified translations. The Claimant undertakes to provide a certified translation of any document in the Exhibit to the extent it is relevant and required for this international arbitration.

[2] **C-1**, Law No. L/2011/006/CNT of 9 September 2011 establishing the Mining Code of the Republic of Guinea, **C-2**, Law No. L/2013/053/CNT of 8 April 2013 amending certain provisions of Law No. 2011/006/CNT of 9 September 2011 establishing the Mining Code of the Republic of Guinea, **C-3**, Consolidated Mining Code [Law No. L/2011/006/CNT of 9 September 2011, as amended by Law No. L/2013/053/CNT of 8 April 2013] ("**Mining Code**"); **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 219, p. 7.

[3] **C-5**, Decree D/2025/0067/PRG/CNRD/SGG on the Withdrawal of Mining Concessions, Industrial Operating Permits, and Semi-Industrial Operating Permits Granted to Companies dated May 14, 2025.

[4] For the reasons detailed in this Notice of Arbitration, the Claimant maintains the revocation was unlawful and therefore *void ab initio* and of no legal effect. All references to revocation in this Notice of Arbitration should be understood as subject to this caveat.

**B**      **The parties**

**B.1**    **The Claimant**

4.      The Claimant (Axis Minerals Resources SA) is a *Société Anonyme* incorporated under the laws
        of the Republic of Guinea, with company number RCCM/GC-KAL/044.314A/2013. Its
        registered office is Résidence Corail, Bloc F - Suite 1004, Quartier Camayenne, Commune of
        Dixinn, BP: 5099, Conakry, the Republic of Guinea and its contact details are: Telephone 00224
        612127135, Email: vosw@osw.global.

5.      The Claimant is represented in these proceedings by:

        **Jones Day**
        Stephen Pearson
        250 Vesey Street
        New York, New York 10281-1047
        +1 212 326 3939
        Email: sjpearson@jonesday.com

        Michelle Bradfield
        21 Tudor Street
        London EC4Y 0DJ
        + 44 207 039 5959
        Email: michellebradfield@jonesday.com
        (Ref: 106980.000001)

6.      All communications to the Claimant must be sent care of its legal representatives at the
        addresses set out above.

**B.2**    **The Respondent**

7.      The Respondent is the Republic of Guinea.

8.      Service of this Notice of Arbitration shall be made on the Respondent using the following
        addresses:

        His Excellency General Mamadi Doumbouya
        President of the Republic
        Palais Mohamed V
        Conakry, Republic of Guinea

His Excellency Mr. Morissanda Kouyaté

Head of the Ministry of Foreign Affairs, African

Integration and Guineans Living Abroad

Koloma – commune de Ratoma

Conakry, Republic of Guinea


His Excellency Mr. Bouna Sylla

Minister of Mines and Geology of the Republic of Guinea

Almamya, Municipality of Kaloum

Conakry, Republic of Guinea


Maître Mohamed Sampil

Agent judiciaire de l'Etat

Boulbinet, Commune de Kaloum

Former headquarters of the Agence Française de Développement (AFD)

Conakry, Republic of Guinea


**C**      **Factual background**

9.      The Respondent's actions have resulted in several breaches of the Mining Code, including the unlawful revocation of the Claimant's mining rights in Guinea. In order to contextualize the Respondent's breaches of the Mining Code, the Claimant sets out below the following background facts:

   9.1      Initial prospecting activities (Section C.1);

   9.2      Award of the Claimant's Operating Permit (Section C.2);

   9.3      Establishment of mining operations (Section C.3); and

   9.4      The May 14 Decree and the Respondent's revocation of the Claimant's Operating Permit (Section C.4).

**C.1**      **Initial prospecting activities**

10.      On September 2, 2013 pursuant to Order No. A/2013/4539/MMG/SGG, the Claimant received bauxite prospecting permits ("**Prospecting Permits**") permitting it to undertake exploration

activities on plateaus in the western part of the Republic of Guinea identified by the following coordinates ("**Prospecting Area**"):

- "**Permit 1**" is defined by the following points: A: 10°37'00" N - 13°50'45" W, B: 10°37'00" N - 13°45'00"W, C: 10°15'00" N - 13°45'00"W and D: 10°15'00" N - 13°50'45" W, which identify an area of 428 square kilometers.

- "**Permit 2**" is defined by the following points: A: 10°15'00" N - 13°50'45" W, B: 10°15'00" N - 13°30'00" W, C: 10°09'15" N - 13°30'00"W and D: 10°09'15" N - 13°50'45" W, which identify an area of 404 square kilometers.

11.    The Prospecting Permit was renewed on August 29, 2016, by Order No. A2016/4063/MMG/SGG after retrocession of the initial area.

12.    In the following years, the Claimant pursued the prospecting activities and other preparatory activities to determine the feasibility of the establishment of a mining operation within the Prospecting Area, including but not limited to:

12.1    drilling holes across the plateaus within the Prospecting Area to collect and analyze samples;

12.2    constructing of a 30 kilometer road from the Koniokhoure plateau to a jetty at Bobo;

12.3    completing a study on environmental and social impacts;

12.4    undertaking pre-feasibility studies;

12.5    conducting bathymetry on the Fatala River; and

12.6    undertaking road topography and geotechnics in the port area.

**C.2    Award of the Claimant's Operating Permit**

13.    On October 13, 2017 after consideration of a detailed feasibility study and other material provided by the Claimant in accordance with Article 30 – II of the Mining Code, the General Manager of the National Service for Coordination of Mining Projects wrote to the Minister of Mines and Geology to communicate that the Technical Committee, which was responsible for

validating feasibility studies, recommended that the Claimant be awarded an Industrial Operating Permit.[5]

14.   Accordingly, on November 2, 2018, the then President of Guinea, Professor Alpha Condé, issued Decree D/2018/267/PRG/SGG (Claimant's Operating Permit), which awarded to the Claimant "*one (1) industrial mining operating permit for Bauxite, covering an area of 425.36 km²*"[6] identified by the following map (1/200,000 scale) and latitude and longitude coordinates ("**Exploitation Area**"):

| Ordre | Lat Deg | Lat Min | Lat Sec | N/S | Long Deg | Long Min | Long Sec | O/E |
|---|---|---|---|---|---|---|---|---|
| 1 | 10 | 37 | 0.26 | N | - 13 | 44 | 59.32 | O |
| 2 | 10 | 15 | 0.39 | N | - 13 | 44 | 59.34 | O |
| 3 | 10 | 15 | 0.40 | N | - 13 | 50 | 44.34 | O |
| 4 | 10 | 37 | 0.27 | N | - 13 | 50 | 44.32 | O |



Plan du site d'exploitation minière industrielle

15.   Industrial Mining Operating Permit is defined in Article 1 of the Mining Code as follows:

"*Industrial or Semi-industrial Mining Operating Permit (*Permis d'exploitation minière, industrielle ou semi industrielle*): Mining Title relating to an area defined by geographic coordinates, granted by decree of the President of the Republic, conferring upon its holder the exclusive right to search, Prospect, operate and freely dispose of*

---

[5] **C-6**, Letter from the General Manager, National Service for Coordination of Mining Projects, Ministry of Mines and Geology [*Service National de Coordination des Projets Miniers*] to the Minister of Mines and Geology, dated October 13, 2017, with Mail Circulation Sheet [*Fiche de circulation du courrier*], dated October 17, 2017, p. 2.

[6] **C-7**, Decree D/2018/267/PRG.SGG Granting an Industrial Mining Operating Permit to Axis Minerals Resources - S.A. dated November 2, 2018, p. 1.

*the Mining Substances for which it is issued, within a specified area and without limitation as to depth.*"[7]

16.     By virtue of Article 28 of the Mining Code, the Claimant's Operating Permit conferred on it "*the exclusive right of reconnaissance, prospecting, operation and free disposal of the mining substances for which it is issued, within the limits of its area and without limitation as to depth*".[8] Pursuant to Article 28, the Claimant's Operating Permit was a "*moveable, divisible and leasable right*".[9]

17.     The term of the industrial operating permit awarded was fifteen years[10] and was renewable in accordance with Article 33 of the Mining Code and as stated in Article 2 of the Decree D/2018/267/PRG/SGG. Article 33 of the Mining Code further specifies the process for renewal of the permit:

    "*The term of an Industrial or Semi-industrial Operating Permit shall be renewed several times, at the request of its holder and under the same conditions as for the award of the Permit, each time for a period of not more than five years, when the holder has met its obligations stipulated upon the issue or renewal of the Title and those arising under this Code, its implementing regulations and the terms of reference, or the Mining Agreement.*"[11]

18.     Accordingly, the Claimant's Operating Permit had a primary term of validity until November 1, 2033, which was then renewable for five-year periods. The Claimant had every intention of applying for an extension at the appropriate time, expected to be fully compliant with its obligations and therefore to obtain a renewal of the Claimant's Operating Permit in accordance with Article 33.

**C.3     Establishment of mining operations**

19.     On March 29, 2019, the Claimant entered into an agreement ("**Farmout Agreement**") with Alliance Guinéenne de Bauxite d'Alumine et D'Aluminium SA ("**AGB2A**") under which AGB2A undertook to carry out development work and perform mining activities in the

---

[7] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 1, p. 1.

[8] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 28, p. 1.

[9] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 28, p. 1.

[10] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 32, p. 3.

[11] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 33, p. 3.

Exploitation Area, in exchange for a royalty. The development work included construction and commissioning of infrastructure and installations for mining the deposit, logistics and transportation activities, delineation drilling, construction of roads, a railway line and a port, stripping of waste rock, communications infrastructures and electrical installations for the development of the deposit. The royalty was fixed initially at 1 USD per dry ton of bauxite exported but was later increased to 2 USD per dry ton exported, pursuant to an Addendum to the Farmout Agreement, which was executed on September 8, 2022.

20.    On May 28, 2019, the then Minister of Mines, Mr. Abdoulaye Magassouba, wrote to the General Manager of the Claimant to communicate the Respondent's approval of the Farmout Agreement pursuant to Article 90 of the Mining Code.[12]

21.    Since 2020, extensive development works have been undertaken and the mining operations established inside the Exploitation Area have been producing and exporting bauxite ore in increasing quantities ("**Claimant's Mining Operation**"). This has included a beneficiation plant, a bridge (approximately 350 meters in length), and a mining road (approximately 75 kilometers in length). In the weeks preceding the suspension of operations due to the issuance of the May 14 Decree (see below at paragraphs 22 to 24), the Claimant's Mining Operation was producing an average of 169,138 metric tons per day.

### C.4    The May 14 Decree and the Respondent's revocation of the Claimant's Operating Permit

22.    As noted above in the Executive Summary, by issuance of the May 14 Decree, the Respondent "*revoked and returned to the State free of charge*"[13] 51 mining titles listed in a table under Article 1 of the May 14 Decree, including the Claimant's Operating Permit:

| 47 | AXIS MINERALS | BAUXITE | D/2018/267/PRG/SGG | 02/11/2018 01/11/2033 |
|----|---------------|---------|---------------------|-----------------------|

23.    The May 14 Decree was announced on national television on the evening of May 14, 2025.[14]

---

[12] **C-8**, Letter from the Minister of Mines and Geology to the General Manager of Axis Minerals Resources S.A. dated May 28, 2019.

[13] **C-5**, Decree D/2025/0067/PRG/CNRD/SGG on the Withdrawal of Mining Concessions, Industrial Operating Permits, and Semi-Industrial Operating Permits Granted to Companies dated May 14, 2025, p. 1.

[14] **C-9**, Recording of televised announcement of Decree D/2025/0067/PRG/CNRD/SGG [Unofficial transcript], Video accessible at < https://www.dailymotion.com/video/x9jjbju >.

24.    On May 15, 2025, the Directorate-General of the National Police issued a Circular Note to the Regional Police Directors, Central Commissioners, and Special Commissioners for Mines and Quarries (the "**Closure Order**") in execution of the May 14 Decree.[15] Following issue of the Closure Order, the Guinean police attended the Claimant's Mining Operation and enforced a compulsory suspension of all mining operations located in the Exploitation Area. All machinery at the Claimant's Mining Operation was seized, and all personnel were instructed to vacate the site immediately. The Claimant understands that the Guinean police continue to monitor the Exploitation Area and are not allowing any resumption of mining operations. Consequently, the Claimant's Mining Operation has been suspended since this time.

25.    In the days following the May 14 Decree, the Claimant wrote repeatedly to the Ministry of Mines and Geology to request additional details and challenge the unlawful withdrawal of the Claimant's Operating Permit and the Respondent's subsequent conduct in execution of the May 14 Decree.

26.    Specifically, on May 19, 2025, the Claimant wrote to the Ministry of Mines and Geology "*to request detailed information about the withdrawal*" of the Claimant's Operating Permit and stated:

> "… *We are particularly surprised to see Axis included in this list, especially as it has not received any prior formal notice to comply with any legal requirements or the financial requirements with which we are in full compliance as the holder of the operating licence. According to the general principles of law, the withdrawal of a licence should be preceded by a formal notice, that goes unheeded, allowing a reasonable length of time. This doesn't seem to have been the case here, which comes as a great surprise to us, as we've been operating in Guinea since 2013.*
>
> *We would also like to express our willingness to promote constructive dialogue with a view to working together on possible ways of re-establishing our good relations, in strict compliance with the legislative, environmental and social framework in force.*
>
> *We would be grateful if you could provide us with the precise reasons for this decision, as well as any conditions under which negotiations could be initiated. We hold a mining*

---

[15] **C-10**, Circular Note issued to the Regional Police Directors; Central Commissioners; Special Commissioners for Mines and Quarries dated May 15, 2015.

*licence and were forced to cease our activities as a result of this surprising decree, which was imposed on us without prior notice ...*"[16]

27.    No response was received to this correspondence.

28.    Subsequently, on May 26, 2025, the Claimant again wrote to the Ministry of Mines and Geology following issue of the Closure Order and the enforced suspension of the Claimant's Mining Operation and stated:

"*With the greatest respect for the authority of your departments, we would like to point out that the mine run by Axis was in full operation, in accordance with its Granting Decree, and that Axis did not commit any of the offences referred to in the Withdrawal Decree, in particular with regard to:*

- *failure to start work within the required timeframe,*

- *discontinuation of mining activities,*

- *or any other substantial breach of the obligations associated with the licence.*

*In these circumstances, the Closure Order for the Axis mine has no legal basis and constitutes a clear violation of our company's acquired rights, as well as an unjustified attack on the legal security of investments.*

*Consequently, we have the honour of respectfully requesting from your high authority the withdrawal, within 72 hours of the aforementioned Closure Order, as well as written confirmation of the immediate lifting of any measure suspending or interrupting the activities of Axis.*"[17]

29.    This correspondence also went without any reply or acknowledgment from the Respondent.

30.    Additionally, the Claimant has made repeated attempts to meet with officials from the Ministry of Mines and Geology, and more generally officials of the Respondent, to remedy the unlawful actions of the Respondent. All these attempts have been in vain. The Respondent has refused all meetings and has provided no explanation for its actions.

---

[16] **C-11**, Letter from Axis Minerals Resources SA to the Minister of Mines and Geology dated May 19, 2025, p. 1.

[17] **C-12**, Letter from Axis Minerals Resources SA to the Minister of Mines and dated May 26, 2025, p. 1.

31.     On June 12, 2025, the Claimant wrote to the Respondent setting out the Claimant's position as to why withdrawal of the Claimant's mining rights was unlawful and extended an invitation to initiate amicable settlement under Article 219 of the Mining Code.[18]

**D      The Respondent's Breaches of the Mining Code**

**D.1    No proper grounds for revocation of the Claimant's Operating Permit**

32.     Article 1 of the May 14 Decree stated that the "*mining concessions, industrial operating permits and semi-industrial operating permits*" identified in the May 14 Decree, including the Claimant's Operating Permit, were "*revoked and returned to the State free of charge*" pursuant to the provisions of Articles 3, 34, 77, 82, 88, and 89 et seq. of the Mining Code and Article 71 of Decree D/2014/012/PRG/SGG of January 17, 2014, on the Management of Mining Authorisations and Rights ("**Mining Management Decree**").[19]

33.     The Mining Code sets out the general legal framework governing the mining sector in Guinea. It establishes, inter alia:

- the different categories of mining titles (prospecting, operating, artisanal, etc.);

- the terms and conditions for obtaining such titles;

- the rights and obligations of titleholders and the State; and

- the fiscal and environmental provisions.

34.     The Mining Management Decree provides the rules of procedure for the issuance, renewal, transfer, suspension, and cancellation of mining titles. In particular, it:

- outlines the procedural steps for applications, technical evaluations, approvals, and publication; and

- allocates institutional responsibilities for administration of the mining law in Guinea.

---

[18] **C-13**, Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Presidency) dated June 12, 2025; **C-14**, Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Ministry of Mines and Geology) dated June 12, 2025.

[19] **C-15**, Decree D/2014/012/PRG/SGG on the Management of Mining Authorisations and Rights dated January 17, 2014; **C-16**, Certified English Translation of Relevant Management of Mining Authorisations and Rights Decree provisions: Article 71.

35.    The Claimant maintains that none of the provisions in the Mining Code have been breached, nor has Article 71 of the Decree. Each of these provisions are addressed below.

36.    Article 3 of the Mining Code states that:

> "*Mineral Substances or fossil substances contained in the subsoil or existing on the surface, as well as ground water and geothermal deposits, on the territory of the Republic of Guinea and in the exclusive economic Zone, are the property of the State and may not be the object of any form of private appropriation, save as otherwise provided for in this Code, and in the Code on State and Other Land (*Code Foncier et Domanial*).".*

> *However, holders of Mining Titles or Authorisation for the use of Mining or Quarry Substances acquire ownership of the extracted substances. The rights of ownership to the substances are distinct from the ownership of the surface*."[20]

37.    As acknowledged in Article 3, while there is a general prohibition on the private appropriation of "*Mineral Substances*", this general prohibition is subject to a qualification that permits private appropriation of Mineral Substances as provided for in the Mining Code itself. Article 3 also acknowledges expressly that holders of Mining Titles for the use of mining or quarry substances, such as the Claimant, acquire ownership over extracted substances and hold rights of ownership to the substance, distinct from the ownership of the surface. Accordingly, there is nothing in Article 3 itself that provides an independent basis or legal grounds for the revocation of the Claimant's Operating Permit pursuant to the May 14 Decree.

38.    Article 34 of the Mining Code places obligations, inter alia, on the holder of an Industrial Operating Permit to "*commence development works within a maximum period of one year as from the date of issue of the Permit*", failing which "*the holder shall be liable to a penalty for delay of 100,000 USD per month for the first three months*".[21] If, after 18 months from the date of the award the holder has still not started work, "*the State reserves the right to revoke or cancel the Title*".[22]

39.    As detailed above at paragraphs 19 to 21, development work began in 2019 (within a year of the award of the Claimant's Operating Permit on November 2, 2018) and the site has been

---

[20] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 3, p. 1.

[21] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 34, p. 4.

[22] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 34, p. 4.

producing bauxite ore from 2020 in increasing quantities. Accordingly, Article 34 does not provide legal grounds for revocation of the Claimant's Operating Permit.

40.     Article 77 of the Mining Code provides that applications for renewal of Prospecting Permits, Operating Permits and Mining Concessions must be submitted "*not less than three months for a Prospecting Permit or six months for an Operating Permit or Mining Concession, prior to the end of the current term of the Mining Title*."[23] Relatedly, Article 82 of the Mining Code provides that a Mining Title or Authorization "*shall expire at the end of the period for which it was awarded*", after which "*the rights conferred on its holder shall revert to the State free of charge*".[24]

41.     However, as noted at paragraph 18 above, the current term of the Claimant's Operating Permit does not end until November 1, 2033, and therefore this does not provide a ground for the 14 May Decree. Accordingly, Articles 77 and 82 can have no application to the Claimant's Operating Permit.

42.     Article 88 of the Mining Code provides a list of specific grounds on which Mining Titles and Authorizations issued pursuant to the Mining Code "*may be revoked by the issuing authority*".[25] Relatedly, Article 71 of the Mining Management Decree describes certain situations in which withdrawal of an industrial or semi-industrial operating permit or mining concession may be revoked.[26]

43.     However, importantly, Article 88 of the Mining Code prescribes a specific procedure for revocation which must be followed:

> "*Revocation may <u>only occur</u> after formal notice sent by the Minister to the holder of the Mining Title or the Authorisation requesting the holder to provide, within the periods indicated below, proof of compliance with its obligations before the date of the formal notice:*
>
> - *One month for Prospecting Permits and Authorisations; and*

---

[23] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 77, p. 5.

[24] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 82, p. 5.

[25] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 88, p. 5.

[26] **C-15**, Decree D/2014/012/PRG/SGG on the Management of Mining Authorisations and Rights dated January 17, 2014; **C-16**, Certified English Translation of Relevant Management of Mining Authorisations and Rights Decree provisions, Article 71, p. 1.

- *Forty-five days for the Operating Permit and Mining Concession.*"[27]

44.  This procedural requirement is also found in Article 71 of the Mining Management Decree, which provides:

> "*In the event that these infringements are found, DNM or other competent services shall send the holder formal notice of forty-five (45) days reminding him of the penalties incurred as a result of breach of his obligations.*
>
> *If, on expiry of the above period, the obligations set out in the formal notice have not been fulfilled or the formal notice has not been acted upon, the industrial or semi-industrial operating permit or mining concession shall be revoked by decree after consultation with the National Mining Commission, without prejudice to the application of the penalties provided for in the Mining Code.*
>
> *In the event that, following formal notice, the permit holder has begun to undertake regularization measures, he may still be granted ninety (90) days to update all obligations. If following this period the required obligations are not satisfied, the industrial or semi-industrial operating permit or mining concession shall be revoked by decree*".[28]

45.  Relevantly, in the present case, no formal notice was issued by the Respondent, nor did the Respondent specify any ground for withdrawal of the Claimant's Operating Permit that was applicable to the Claimant. Further, despite immediate and repeated requests for an explanation, as detailed in paragraphs 25 to 31, it remains the case that no explanation has been provided to the Claimant for the  revocation of the Claimant's Operating Permit pursuant to the May 14 Decree.

46.  Accordingly, not only is there no legitimate basis for including the Claimant in the May 14 Decree, the Respondent has not even followed the mandatory procedure for the revocation of Mining Titles, as outlined in Article 88 of the Mining Code. Consequently, the May 14 Decree is unlawful and/or invalid, and has been issued without a proper basis.

---

[27] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 88, p. 6 (emphasis added).

[28] **C-15**, Decree D/2014/012/PRG/SGG on the Management of Mining Authorisations and Rights dated January 17, 2014; **C-16**, Certified English Translation of Relevant Management of Mining Authorisations and Rights Decree provisions, Article 71, p. 1.

**D.2     Breach of the Claimant's General Freedoms guaranteed by the Mining Code**

47.     Article 95 of the Mining Code titled "*General Freedoms*" is as follows:

> "*In accordance with international conventions, and subject to the laws and regulations of the Republic of Guinea, all persons referred to in Article 15 shall be guaranteed:*
>
> - *the right to freely dispose of their property and organize their enterprise;*
>
> - *the right to recruit and dismiss employees in accordance with current laws and regulations;*
>
> - *free access to materials;*
>
> - *freedom of circulation of their personnel and products within the Republic of Guinea;*
>
> - *the right to import goods and services and any funds necessary for their activities;*
>
> - *the right to dispose of products on international markets; to export and dispose of products on foreign markets.*"[29]

48.     Persons referred to in Article 15 (titled "*Rights of Individuals*") of the Mining Code are as follows:

> "*All individuals or legal entities with the necessary technical and financial capacity to successfully complete the activities in question may carry out reconnaissance for signs and search for Mining or Quarry Substances, subject to the conditions set out in this law.*
>
> *Subject to the provisions of this law, Mining or Quarry Substances may be exploited by the following:*
>
> - *any individual or legal entity, whether public or private, established under Guinean law, having the technical and financial capacity to undertake the operation requested;*

---

[29] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 95, p. 7.

- *any individual or legal entity of Guinean nationality who is duly authorised to carry out semi-industrial or artisanal operations.*

*A decree of the President of the Republic of Guinea shall specify the content of what is meant by "Technical and financial capacity"…."*[30]

49.    Article 90 of the Mining Management Decree specifies the content of "*Technical and financial capacity*" for the purposes of Article 15 of the Mining Code in the following terms:

"*For the purposes of Article 15 of the Mining Code,* "technical and financial capacities" *are the minimum requirements of professional, technical and financial capacities that the contracting authority or the Administration considers essential for an applicant to be granted a mining title or authorization.*

*The requirements of the contracting authority or the Administration as regards financial and technical capacities must be proportionate and adapted to the nature of the deposit and the type of title or authorization sought.*"[31]

50.    As a Guinean incorporated company which held an operating permit (namely, the Claimant's Operating Permit) pursuant to which there was an established mine (i.e., the Claimant's Mining Operation which was producing bauxite ore until the May 14 Decree), the Claimant is a person referred to in Article 15 and is a beneficiary of the "*General Freedoms*" guaranteed under Article 95 of the Mining Code.

51.    In circumstances where the May 14 Decree was not a lawful or valid revocation of the Claimant's Operating Permit, the Claimant contends that all actions taken by agents and instrumentalities of the Respondent in execution of the May 14 Decree in relation to the Claimant's Mining Operation have been undertaken unlawfully and in violation of the "*General Freedoms*" guaranteed to the Claimant under Article 95 of the Mining Code.

52.    These breaches of the Claimant's "*General Freedoms*" include, but are not limited to, breaches of the Claimant's rights to:

52.1    dispose freely of its property and organize its enterprise;

---

[30] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 15, p. 1.

[31] **C-15**, Decree D/2014/012/PRG/SGG on the Management of Mining Authorisations and Rights dated January 17, 2014; **C-16**, Certified English Translation of Relevant Management of Mining Authorisations and Rights Decree provisions, Article 90, p. 1.

52.2    freedom of circulation for its personnel and products within the Republic of Guinea; and

52.3    dispose of products on international markets and to export and dispose of products on foreign markets

by reason of the enforced suspension of operations carried out by the Guinean police pursuant to the May 14 Decree and/or the Closure Order issued by the Directorate-General of the National Police (see paragraph 24 above).

**E    Jurisdiction**

53.    The arbitration agreement is set out in Article 219 of the Mining Code, which provides:

> "*Disputes between one or more mining investors and the State with regard to the extent of their rights and obligations, the performance or non-performance of their commitments at the end of their Titles and the assignment, transfer or Lease of their rights resulting therefrom may be subject to the procedure for amicable settlement.*
>
> *If a party believes that the procedure of amicable settlement has failed, the dispute shall be submitted either to the competent Guinean courts or to national <u>or international arbitration.</u>*
>
> *In all other cases, disputes arising from the interpretation and implementation of this Code are to be brought before the competent Guinean courts.*" [32]

54.    As is clear from the express language of Article 219, an aggrieved party can elect one of three pre-approved fora to finally determine any dispute, and the other party has irrevocably submitted to that elected forum by means of Article 219.

55.    As detailed at paragraphs 12 to 21 above, the Claimant has made substantial pecuniary and non-pecuniary investments over a significant period of time to pursue prospecting activities in Guinea, obtain the Claimant's Operating Permit, and then to establish the Claimant's Mining Operation in Guinea. The Claimant is therefore a "mining investor" for the purposes of the Mining Code and enjoys recourse to the dispute resolution mechanism provided for in Article 219 of the Mining Code.

---

[32] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 219, p. 7 (emphasis added).

56.     As detailed at paragraphs 32 to 52 above, there is a clear dispute that has crystalized between the Claimant and the Respondent with regard to the existence (and thereby the extent) of the Claimant's rights pursuant to the Claimant's Operating Permit, the Respondent's correlative obligations in relation to the same, and the Respondent's obligations to comply with the Mining Code and honor the guarantees given to the Claimant by it under the Mining Code.

57.     As detailed above, in the June 12, 2025 Letter, the Claimant wrote to the Respondent to seek initiation of the amicable settlement procedure. As part of that correspondence and to preserve the status quo pending the completion of that process, the Claimant requested that the Respondent:

57.1    "*take all necessary steps to ensure that the 14 May Decree does not apply to Axis and that Axis' Mining Rights are restored fully; and*

57.2    *take all necessary steps to allow the Koniokhoure mine to operate, as it was prior to the 14 May Decree, which includes (but is not limited to) lifting all orders and other directions made to suspend the operations of the Koniokhoure mine, including the withdrawal of the Closure Order*…"[33]

58.     The June 12, 2025 letter requested that the Respondent confirm in writing its agreement to participate in the amicable resolution procedure provided for within Article 219 of the Mining Code. The June 12, 2025 letter stated that the Respondent's failure to respond within the time requested would be treated by the Claimant as a refusal to participate such that the amicable resolution procedure provided for in Article 219 had failed and then the Claimant intended to pursue a claim in its chosen forum in accordance with Article 219 of the Mining Code.

59.     On June 13, 2025, the Claimant received confirmation (in the form of copies stamped with acknowledgements of receipt) that the June 12, 2025 Letter had been received by no later than June 13, 2025, by both the Central Secretariat of the Presidency of the Republic of Guinea and the Ministry of Mines and Geology, on behalf of the Respondent.[34]

60.     No response was received. Consequently, on July 3, 2025, the Claimant sent an additional letter to the Respondent further requesting amicable settlement and requesting a response. The letter

---

[33] **C-13** Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Presidency) dated June 12, 2025, p. 3; **C-14**, Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Ministry of Mines and Geology) dated June 12, 2025, p. 3.

[34] **C-13** Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Presidency) dated June 12, 2025; **C-14**, Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Ministry of Mines and Geology) dated June 12, 2025.

was received by each of the Central Secretariat of the Presidency of the Republic of Guinea,[35] the Head of the Ministry of Foreign Affairs, African Integration, and Guineans Living Abroad[36] and the Ministry of Mines and Geology,[37] on behalf of the Respondent.

61.    At the present time, it remains the case that no response has been received from the Respondent. Additionally, the Claimant has never received formal notification from the Respondent of the May 14 Decree.

62.    By reason of the matters detailed in paragraphs 26 to 31 and 57 to 61 above, it is clear to the Claimant that amicable settlement provided for in Article 219 of the Mining Code has failed.

63.    Accordingly, the Claimant hereby initiates international arbitration pursuant to Article 219 of the Mining Code.

**F    Execution of the Respondent's revocation of the Claimant's Operating Permit is suspended by the challenge of that decision made in this Notice of Arbitration pursuant to Article 89 of the Mining Code**

64.    Article 89 of the Mining Code contains the following provision:

> "*An challenge against the revocation decision prior to expiry of a period of sixty days as from notification of such decision shall suspend execution thereof.*
>
> *A decision to revoke the title may, however, stipulate that the suspensive effect of a challenge shall be conditional on the holder providing a guarantee, the amount of which will be acquired by the State if the challenge is dismissed.*"[38]

65.    Article 89 does not designate a specific body to receive and adjudicate the challenge provided for in Article 89, which means that any such dispute is to be determined under the general dispute resolution provision found in Article 219. Accordingly, any challenge under Article 89 can be directed according to the aggrieved party's election to any one of the three pre-approved

---

[35] **C-17**, Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Presidency) dated July 3, 2025.

[36] **C-18**, Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Ministry of Foreign Affairs, African Integration and Guineans Living Abroad) dated July 3, 2025.

[37] **C-19**, Letter from Jones Day to the Republic of Guinea (with Acknowledgment of Receipt from the Ministry of Mines and Geology) dated July 3, 2025.

[38] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended: Article 89, p. 6-7.

fora that are identified in Article 219 for resolution of disputes between a mining investor and the Respondent "*with regard to the extent of their rights and obligations*".[39]

66.    In accordance with Articles 89 and 219 of the Mining Code, the Claimant elects international arbitration for determination of its challenge pursuant to Article 89, which is hereby initiated by issuance of this Notice of Arbitration.

67.    Further, it is to be noted that:

67.1    as detailed in paragraph 61 above, the Claimant has not received any formal notice or notification of the May 14 Decree. As such, no formal notification of the Respondent's decision to revoke the Claimant's Operating Permit has been given for the purposes of Article 89; and

67.2    the May 14 Decree did not stipulate that the suspensive effect of a challenge is conditional on the holder providing a guarantee. Accordingly, there is no guarantee requirement attached to the suspension of execution of the Decree pursuant to Article 89. It therefore takes immediate effect on institution of the Claimant's challenge, which is this Notice of Arbitration.

68.    Accordingly, pursuant to Article 89 of the Mining Code, the Respondent's execution of the May 14 Decree insofar as it purports to revoke the Claimant's Operating Permit is suspended pending resolution of the challenge made in these proceedings.

**G    Appointment of Arbitrator and constitution of a Tribunal**

69.    The international arbitration agreement set forth in Article 219 of the Mining Code is non-prescriptive as to the manner in which the Tribunal must be constituted and it is for the aggrieved party to elect.

70.    In accordance with its rights to pursue international arbitration under Article 219, the Claimant elects that this arbitration shall be seated in New York, NY, USA, and further elects that this arbitration shall be conducted by a three person international arbitral tribunal.[40]

---

[39] **C-4**, Certified English Translation of Relevant Mining Code Provisions, as amended, Article 219, p. 7.

[40] Like the Respondent, the United States of America is a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, opened for signature 10 June 1958, 330 UNTS 3 (entered into force 7 June 1959) ("**New York Convention**").

71.     In accordance with well-recognized procedures for complex international arbitration, the Claimant and Respondent shall each elect one Arbitrator ("**Party Appointed Member**"); then, a third Arbitrator ("**Third Member**") shall be appointed jointly by the individuals elected by the Claimant and Respondent to serve as the Third Member and chair the Tribunal. Once constituted, the Tribunal shall promptly determine the rules that should apply to this ad hoc arbitration and issue an appropriate procedural order. The Claimant's position is that the current (2018) CPR International Non-Administered Arbitration Rules ("**CPR Rules**") published by the International Institute for Conflict Prevention & Resolution ("**CPR**"), 30 East 33rd Street, 6th Floor, New York, NY 10016, should be adopted and applied. In accordance with CPR Rule 3.2, this arbitration shall be deemed to have commenced on the day the Respondent receives this Notice of Arbitration.

72.     The Claimant hereby elects O. Thomas Johnson of McLean, Virginia, USA as its Party Appointed Member of the Tribunal to be constituted in respect of this dispute.

73.     Thomas Johnson's contact details are:

O. Thomas Johnson
1406 Langley Pl
McLean, VA 22101
United States of America
Telephone Number: +1 202 390 2637
Email address: thomas.johnson022@gmail.com

74.     Within 30 days of the date of receipt of this Notice of this Arbitration, the Respondent is hereby required, in writing, to serve a Notice of Defense to this Notice of Arbitration:

74.1    setting out any comment on the Notice of Arbitration that the Respondent may deem appropriate;

74.2    setting out a statement of the general nature of the Respondent's defense(s);

74.3    setting out the name, address, telephone number, and email address of the Party Appointed Member elected by the Respondent; and

74.4    indicating whether it objects to the CPR Rules applying to the arbitration.

75.     If the Respondent fails to serve its Notice of Defense and/or elect its Party Appointed Member and/or state its position on the applicable rules within 30 days, the Claimant reserves the right to seek an order from the U.S. District Court for the Southern District of New York or any other

judicial body or tribunal with appropriate jurisdiction compelling arbitration in accordance with the procedures described below:[41]

75.1    the CPR (or such other appointing authority as the Court shall designate) shall appoint an Arbitrator on behalf of the Respondent;

75.2    the two Arbitrators will then seek to reach an agreement as to the Third Member, who shall chair the arbitral Tribunal;

75.3    in the event that the Party Appointed Members of the Claimant and Respondent are unable to reach an agreement as to the Third Member within 20 days, the CPR shall also appoint such Third Member; and

75.4    once the arbitral Tribunal is constituted, it shall administer the international arbitration in respect of this dispute under the CPR Rules (or such other rules as the Court may designate).

## H    Governing law

76.    As the claims brought by the Claimant are made under the Guinean Mining Code, the substantive law governing those claims is Guinean law.

## I    Language of the arbitration

77.    The Claimant elects and will seek an appropriate direction that the language of the arbitration shall be English.

## J    Relief sought

78.    The Claimant seeks the following relief:

78.1    a declaration that the Respondent's revocation of the Claimant's Operating Permit pursuant to the May 14 Decree did not comply with the Mining Code and was therefore unlawful and/or of no effect;

78.2    a declaration that the Claimant's Operating Permit remains valid and in operation in accordance with the terms on which it was issued pursuant to Decree D/2018/267/PRG/SGG;

---

[41] The Claimant also reserves the right to seek whatever ancillary relief is necessary or appropriate.

78.3    a declaration that the Claimant is, was and remains entitled to continue the Claimant's Mining Operation;

78.4    an order and a declaration that the Respondent shall (i) not take any steps to interfere with the Claimant's rights under the Claimant's Operating Permit and/or the Mining Code and (ii) be obliged take all steps necessary to restore any of the Claimant's rights that have already been interfered with or affected by actions taken by the Respondent, or any of its agents and instrumentalities;

78.5    should it prove necessary, the Claimant reserves the right to seek interim/provisional measures from the Tribunal (or, in its absence, a supervisory court with competent judicial authority) to give effect to the suspension on execution of the May 14 Decree insofar as it impacts the Claimant, or equivalent relief, pending the constitution of the Tribunal or the final disposition of the Claimant's claims herein. Such relief may include a prohibition on the Respondent taking any further action in execution of the May 14 Decree insofar as it applies to the Claimant's Operating Permit, including but not limited to:

78.5.1    failing to cease enforcement of the Closure Order;

78.5.2    failing to cease any other activity by the Guinean police or any other agent or instrumentality of the State to interfere with the resumption and the orderly conduct of the Claimant's Mining Operation;

78.6    the Claimant likewise reserves the right to seek other interim/provisional measures, as needed, to enforce and support this arbitration and/or preserve its rights and/or preserve the status quo, including but not limited to the filing of a petition to compel arbitration;

78.7    an award of costs for these proceedings; and

78.8    any other relief that the Tribunal deems appropriate.

79.    In the event that its primary claims for relief are determined to be unavailable for whatever reason, the Claimant reserves the right to claim other relief, including but not limited to damages. The Claimant hereby reserves its right to amend, amplify, and correct its prayers for relief generally, for instance as to any claims or evidentiary motions sought, as the case may be, in the course of these proceedings, as may be warranted and to the extent permissible under the applicable procedural rules.

**K     Final matters**

80.    All documents in this arbitration should be served on the Claimant's legal representatives at both the New York and London addresses shown in paragraph 5.

*Jones Day*

**Respectfully submitted on 10 July 2025 on behalf of the Claimant by Jones Day of:**

**250 Vesey Street, New York, New York 10281-1047**

**21 Tudor Street, London EC4Y 0DJ**

**AXIS MINERALS RESOURCES SA**

(société constituée en vertu du droit guinéen)

*Demanderesse*

c.

**LA RÉPUBLIQUE DE GUINÉE**

*Défenderesse*

**DEMANDE D'ARBITRAGE**

**10 JUILLET 2025**

JONES DAY

250 Vesey Street, New York, New York 10281-1047, États-Unis d'Amérique

21 Tudor Street, Londres EC4Y 0DJ, Angleterre

Conseil pour la Demanderesse

La version anglaise de la présente Demande d'arbitrage fait foi ; la présente version en langue française est fournie à titre de courtoisie[1]. Les versions anglaise et française de la présente Demande d'arbitrage ont été notifiées à la Partie défenderesse à chacune des adresses indiquées au paragraphe 8 ci-dessous.

**A      Introduction**

1.      La présente Demande d'arbitrage est émise au nom de la Demanderesse, Axis Minerals Resources SA (la « **Demanderesse** » ou « **Axis Minerals** »), à l'encontre de la Défenderesse, la République de Guinée (la « **Défenderesse** » ou la « **Guinée** »), conformément à l'article 219 du Code minier de la République de Guinée de 2011, tel qu'amendé (le « **Code minier** »)[2].

2.      Le différend découle d'un Décret intitulé « *Décret n° D/2025/0067/PRG/CNRD/SGG portant retrait de concessions minières, de permis d'exploitation industrielle et de permis d'exploitation semi-industrielle octroyés à ces sociétés* » émis par le Président de la République de Guinée le 14 mai 2025 (le « **Décret du 14 mai** »)[3], par lequel la Défenderesse a retiré – et retourné à la Guinée – le permis d'exploitation détenu par la Demanderesse, Axis Minerals (le « **Permis d'exploitation de la Demanderesse** »)[4]. Le Décret du 14 mai entendait également retirer cinquante autres permis d'exploitation délivrés à diverses sociétés.

3.      Afin que la Défenderesse puisse retirer un permis d'exploitation minière, un ou plusieurs des motifs de retrait énoncés à l'article 88 du Code minier doivent être remplis. Or, la Demanderesse soutient qu'aucun de ces motifs n'existait en l'espèce, et la procédure de notification obligatoire également prévue à l'article 88 n'a pas été respectée (aucune mise en demeure préalable ou délai de régularisation n'ayant été accordé à la Demanderesse). En conséquence,

---

[1]    Sauf indication contraire, les traductions en anglais figurant dans les annexes ne constituent pas des traductions certifiées. La Demanderesse s'engage à fournir, le cas échéant et dans la mesure où cela s'avérerait pertinent et requis dans le cadre de la présente procédure d'arbitrage international, une traduction certifiée de tout document annexé.

[2]    **C-1**, Loi n° L/2011/006/CNT du 9 septembre 2011 portant Code minier de la République de Guinée ; **C-2**, Loi n° L/2013/053/CNT du 8 avril 2013 portant amendement de certaines dispositions de la Loi n° L/2011/006/CNT du 9 septembre 2011 portant Code minier de la République de Guinée ; **C-3**, Code minier consolidé (Loi n° L/2011/006/CNT du 9 septembre 2011, telle qu'amendée par la Loi n° L/2013/053/CNT du 8 avril 2013) (Code minier) ; **C-4**, Traduction certifiée en anglais des dispositions pertinentes du Code minier, tel qu'amendé, Article 219, p. 7.

       *[Note relative à la traduction française de la présente Demande : lorsque, dans la version anglaise de la Demande d'arbitrage, les notes de bas de page renvoient à la traduction certifiée des dispositions pertinentes du Code minier (C-4), la présente version française se réfère quant à elle au texte original du Code minier en français (C-3)].*

[3]    **C-5**, Décret n° D/2025/0067/PRG/CNRD/SGG du 14 mai 2025 portant retrait de concessions minières, de permis d'exploitation industrielle et de permis d'exploitation semi-industrielle octroyés à ces sociétés.

[4]    Pour les motifs exposés dans la présente Demande d'arbitrage, la Demanderesse soutient que le retrait était illégal et, par conséquent, nul *ab initio* et dépourvu de tout effet juridique. Toutes les références au retrait dans la présente Demande d'Arbitrage doivent être comprises sous cette réserve.

le Décret du 14 mai était illégal, invalide et dépourvu de tout effet juridique. Il en découle que toutes les mesures ultérieures prises par la Défenderesse pour donner effet au Décret du 14 mai étaient également illégales et constituaient une violation des droits de la Demanderesse garantis par le Code minier, et une atteinte aux libertés générales garanties à la Demanderesse en vertu de l'article 95 du Code minier.

**B**      **Les Parties**

**B.1**    **La Demanderesse**

4.      La Demanderesse (Axis Minerals Resources SA) est une société anonyme constituée en vertu du droit guinéen, immatriculée sous le numéro RCCM/GC-KAL/044.314A/2013. Son siège social est situé à Résidence Corail, Bloc F - Suite 1004, Quartier Camayenne, Commune de Dixinn, BP : 5099, Conakry, République de Guinée, et ses coordonnées sont les suivantes : Téléphone : 00224 612127135 ; Courriel : vosw@osw.global

5.      La Demanderesse est représentée dans la présente procédure par :

**Jones Day**
Stephen Pearson
250 Vesey Street
New York, New York 10281-1047
Tél. : +1 212 326 3939
Courriel : sjpearson@jonesday.com

Michelle Bradfield
21 Tudor Street
Londres EC4Y 0DJ
Tél. : + 44 207 039 5126
Courriel : michellebradfield@jonesday.com
(Ref: 106980.000001)

6.      Toutes les communications destinées à la Demanderesse doivent être envoyées à ses représentants légaux aux adresses indiquées ci-dessus.

**B.2    La Défenderesse**

7.      La Défenderesse est la République de Guinée.

8.      La présente Demande d'arbitrage est signifiée à la Défenderesse aux adresses suivantes :

Son Excellence le Général Mamadi Doumbouya
Président de la République
Palais Mohamed V
Conakry, République de Guinée

Son Excellence Monsieur Morissanda Kouyaté
Ministre des Affaires Étrangères, de l'Intégration Africaine et des Guinéens établis à l'Étranger
Koloma, Commune de Ratoma
Conakry, République de Guinée

Son Excellence Monsieur Bouna Sylla
Ministre des Mines et de la Géologie de la République de Guinée
Almamya, Commune de Kaloum
Conakry, République de Guinée

Maître Mohamed Sampil
Agent judiciaire de l'Etat
Boulbinet, Commune de Kaloum
Ancien siège de l'Agence Française de Développement (AFD)
Conakry, République de Guinée

**C    Contexte factuel**

9.      Les mesures prises par la Défenderesse ont entraîné plusieurs violations du Code minier, notamment la révocation illicite des droits miniers de la Demanderesse en Guinée. Afin de replacer dans leur contexte les violations du Code minier commises par la Défenderesse, la Demanderesse expose ci-dessous les faits suivants :

9.1     les activités initiales de recherche (Section C.1) ;

9.2     l'octroi du Permis d'exploitation de la Demanderesse (Section C.2) ;

9.3     la mise en place des opérations minières (Section C.3) ; et

9.4    le Décret du 14 mai et le retrait par la Défenderesse du Permis d'exploitation de la Demanderesse (Section C.4).

**C.1    Les activités de recherche initiales**

10.    Le 2 septembre 2013, conformément à l'arrêté n° A/2013/4539/MMG/SGG, la Demanderesse a reçu un permis de recherche de bauxite (le « **Permis de recherche** ») lui permettant d'entreprendre des activités de recherche sur des plateaux dans la partie occidentale de la République de Guinée identifiés par les coordonnées suivantes (la « **Zone de recherche** ») :

   ▪ Le « **Permis 1** » est défini par les coordonnées suivantes : A: 10°15'00" N - 13°50'45" W, B: 10°15'00" N - 13°30'00" W, C: 10°09'15" N - 13°30'00"W et D: 10°09'15" N - 13°50'45" W, ce qui représente une superficie totale de 428 km$^2$.

   ▪ Le « **Permis 2** » est défini par les coordonnées suivantes: A: 10°37'00" N - 13°50'45" W, B: 10°37'00" N - 13°45'00"W, C: 10°15'00" N - 13°45'00"W and D:  10°15'00" N - 13°50'45" W, ce qui représente une superficie totale de 404 km$^2$.

11.    Le Permis de recherche a été renouvelé le 29 août 2016 suivant l'arrêté n° A2016/4063/MMG/SGG, après rétrocession de la superficie initiale.

12.    Au cours des années suivantes, la Demanderesse a poursuivi les activités de recherche et autres activités préparatoires pour déterminer la faisabilité de l'établissement d'une exploitation minière dans la Zone de recherche, y compris (mais sans s'y limiter) la réalisation :

   12.1    de trous de forage sur les plateaux de la Zone de recherche afin de recueillir et d'analyser des échantillons ;

   12.2    d'une route de 30 kilomètres depuis le plateau de Koniokhouré jusqu'à la jetée de Bobo ;

   12.3    d'une étude sur les impacts environnementaux et sociaux ;

   12.4    d'études de préfaisabilité ;

   12.5    d'une bathymétrie sur le fleuve Fatala ; et

   12.6    d'une topographie routière et géotechnique dans la zone portuaire.

**C.2    L'octroi du Permis d'exploitation de la Demanderesse**

13.    Le 13 octobre 2017, après examen et prise en compte d'une étude de faisabilité détaillée et d'autres documents fournis par la Demanderesse conformément à l'article 30 - II du Code minier, la Directrice générale du Service National de Coordination des Projets Miniers a écrit au Ministre des Mines et de la Géologie pour lui indiquer que le Comité technique en charge de la validation des études de faisabilité, recommandait d'accorder à la Demanderesse un Permis d'exploitation industrielle[5].

14.    En conséquence, le 2 novembre 2018, le Président de la Guinée de l'époque, Professeur Alpha Condé, a publié le Décret n° D/2018/267/PRG/SGG (le Permis d'exploitation de la Demanderesse), qui a accordé à la Demanderesse « *un (1) permis d'exploitation minière industrielle pour la Bauxite, couvrant une superficie de 425,36 km²* »[6] identifiée par la carte suivante (échelle 1/200 000ème) et les coordonnées géographiques ci-dessous (la « **Zone d'exploitation** ») :



| Ordre | Lat Deg | Lat Min | Lat Sec | N/S | Long Deg | Long Min | Long Sec | O/E |
|---|---|---|---|---|---|---|---|---|
| 1 | 10 | 37 | 0.26 | N | - 13 | 44 | 59.32 | O |
| 2 | 10 | 15 | 0.39 | N | - 13 | 44 | 59.34 | O |
| 3 | 10 | 15 | 0.40 | N | - 13 | 50 | 44.34 | O |
| 4 | 10 | 37 | 0.27 | N | - 13 | 50 | 44.32 | O |

Plan du site d'exploitation minière industrielle

15.    Le Permis d'exploitation minière industrielle est défini à l'article 1er du Code minier comme suit :

---

[5]    **C-6**, Courrier de la Directrice Générale du Service National de Coordination des Projets Miniers du Ministère des Mines et de la Géologie au Ministre des Mines et de la Géologie datée du 13 octobre 2017, accompagné de la Fiche de circulation du courrier datée du 17 octobre 2017, p. 2.

[6]    **C-7**, Décret n° D/2018/267/PRG/SGG portant octroi d'un Permis d'exploitation minière industrielle à la société Axis Minerals Resources S.A. daté du 2 novembre 2018, p. 1.

> « *Permis d'exploitation minière, industrielle ou semi-industrielle : Titre minier, portant sur un périmètre délimité par des coordonnées géographiques, octroyé par décret du Président de la République, autorisant son titulaire, dans les limites de son périmètre et sans limitation de profondeur, le droit exclusif de reconnaissance, de Recherche, d'exploitation et la libre disposition des Substances minières pour lesquelles il est délivré* »[7].

16.    En vertu de l'article 28 du Code minier, le Permis d'exploitation de la Demanderesse lui conférait, « *dans les limites de son périmètre et indéfiniment en profondeur, le droit exclusif de reconnaissance, de recherche, d'exploitation et la libre disposition des substances minières pour lesquelles il est délivré* »[8] . En vertu de l'article 28, le Permis d'exploitation de la Demanderesse était un « *droit mobilier divisible et amodiable* »[9].

17.    La durée du permis d'exploitation industrielle accordé était de quinze ans [10] et était renouvelable, conformément à l'article 33 du Code minier et à l'article 2 du Décret n° D/2018/267/PRG/SGG. Le processus de renouvellement du permis était détaillé à l'article 33 du Code minier, comme suit :

> « *La validité du Permis d'exploitation industrielle ou semi-industrielle est, sur la demande de son titulaire et sous les mêmes conditions que pour l'octroi du Permis, renouvelée à plusieurs reprises, chaque fois pour des périodes de cinq ans au plus, lorsque le titulaire a exécuté les obligations mises à sa charge lors de la délivrance ou du renouvellement du Titre et celles résultant du présent Code, de ses textes d'application et du cahier des charges ou de la Convention minière* »[11].

18.    En conséquence, la durée de validité initiale du Permis d'exploitation de la Demanderesse, fixée jusqu'au 1er novembre 2033, était reconductible pour des périodes de cinq ans. La Demanderesse avait la ferme intention de demander une prolongation en temps utile, s'attendait à honorer pleinement ses obligations, et donc à obtenir une reconduction du Permis d'exploitation de la Demanderesse, conformément à l'article 33.

---

[7]    **C-3**, Code minier, Article 1.

[8]    **C-3**, Code minier, Article 28.

[9]    **C-3**, Code minier, Article 28.

[10]    **C-3**, Code minier, Article 32.

[11]    **C-3**, Code minier, Article 33.

**C.3     La mise en place de l'exploitation minière**

19.     Le 29 mars 2019, la Demanderesse a conclu un contrat (l'« **Accord d'amodiation** ») avec l'Alliance Guinéenne de Bauxite, d'Alumine et d'Aluminium SA (« **AGB2A** »), en vertu duquel AGB2A s'est engagée à entreprendre des travaux de développement et à réaliser des activités minières dans la Zone d'exploitation, moyennant une redevance. Les travaux de développement comprenaient la construction et la mise en service des infrastructures et des installations nécessaires à l'exploitation du gisement, aux activités logistiques et de transport, aux forages de délimitation, à la construction de routes, d'une voie ferrée et d'un port, au décapage des stériles, ainsi qu'à la mise en place des infrastructures de communication et des installations électriques liées au développement du gisement. La redevance a été initialement fixée à 1 USD par tonne sèche de bauxite exportée, avant d'être portée à 2 USD par tonne sèche exportée, conformément à un Avenant de l'Accord d'amodiation, conclu le 8 septembre 2022.

20.     Le 28 mai 2019, le Ministre des Mines de l'époque, M. Abdoulaye Magassouba, a écrit au Directeur Général de la Demanderesse pour lui indiquer l'approbation par la Défenderesse de l'Accord d'amodiation conformément à l'article 90 du Code minier.[12]

21.     Depuis 2020, d'importants travaux de développement ont été entrepris et les opérations minières mises en place à l'intérieur de la Zone d'exploitation ont produit et exporté du minerai de bauxite en quantités croissantes (l'« **Exploitation minière de la Demanderesse** »). Cela comprenait notamment une usine de traitement, un pont (d'environ 350 mètres de long) et une route minière (d'environ 75 kilomètres). Dans les semaines précédant la suspension des opérations consécutive à la publication du Décret du 14 mai (voir *infra*, paragraphes 22 à 24), l'Exploitation minière de la Demanderesse produisait en moyenne 169.138 tonnes métriques par jour.

**C.4     Le Décret du 14 mai et le retrait par la Défenderesse du Permis d'exploitation de la Demanderesse**

22.     Comme indiqué plus haut, en publiant le Décret du 14 mai, la Défenderesse a « *retir*[é] *et f*[ait] *gratuitement retour à l'État* »[13], 51 permis d'exploitation minière répertoriés dans un tableau à l'article 1ᵉʳ du Décret du 14 mai, dont le Permis d'exploitation de la Demanderesse :

---

[12]    **C-8**, Courrier du Ministre des Mines et de la Géologie au Directeur Général d'Axis Minerals Resources S.A. du 28 mai 2019.

[13]    **C-5**, Décret nᵒ D/2025/0067/PRG/CNRD/SGG du 14 mai 2025 portant retrait de concessions minières, de permis d'exploitation industrielle et de permis d'exploitation semi-industrielle octroyés à ces sociétés.

| 47 | AXIS MINERALS | BAUXITE | D/2018/267/PRG/SGG | 02/11/2018 01/11/2033 |
|---|---|---|---|---|

23.  Le Décret du 14 mai a fait l'objet d'une annonce à la télévision nationale diffusée dans la soirée du 14 mai 2025[14].

24.  Le 15 mai 2025, la Direction Générale de la Police Nationale a diffusé une Circulaire aux Directeurs Régionaux de la Police, Commissaires Centraux et Commissaires Spéciaux des Mines et Carrières (l'« **Ordre de fermeture** »), en application du Décret du 14 mai[15]. A la suite de l'émission de l'Ordre de fermeture, la police guinéenne s'est rendue sur le site de l'Exploitation minière de la Demanderesse et a procédé à la suspension forcée de toutes les opérations minières situées dans la Zone d'exploitation. L'ensemble des équipements de l'Exploitation minière de la Demanderesse a été saisi et tout le personnel a été sommé de quitter immédiatement les lieux. La Demanderesse comprend que la police guinéenne continue de surveiller la Zone d'exploitation et interdit toute reprise des opérations minières. Par conséquent, l'Exploitation minière de la Demanderesse est suspendue depuis lors.

25.  Dans les jours ayant suivi le Décret du 14 mai, la Demanderesse a écrit à maintes reprises au Ministère des Mines et de la Géologie afin de solliciter des informations complémentaires et de contester le retrait illicite du Permis d'exploitation de la Demanderesse et le comportement subséquent de la Défenderesse en application du Décret du 14 mai.

26.  Plus précisément, le 19 mai 2025, la Demanderesse a écrit au Ministère des Mines et de la Géologie « *pour demander des informations détaillées sur le retrait* » du Permis d'exploitation de la Demanderesse et a indiqué :

> « *Nous sommes particulièrement surpris de constater la mention d'Axis dans cette liste, d'autant plus qu'aucune mise en demeure préalable ne lui a été adressée pour se conformer à d'éventuelles exigences légales ou les exigences financières auxquelles nous nous conformons pleinement en tant que titulaire du permis d'exploitation. Selon les principes généraux du droit, le retrait du permis devrait être précédé d'une mise en demeure, restée sans effet, dans un délai raisonnable. Ce qui ne semble pas avoir été*

---

[14]   **C-9**, Retranscription écrite de l'annonce télévisée du Décret n° D/2025/0067/CNRD/SGG (vidéo accessible au lien suivant : https://www.dailymotion.com/video/x9jjbju).

[15]   **C-10**, Note circulaire aux Directeurs régionaux de la Police, Commissaires centraux, Commissaires spéciaux des Mines et Carrières du 15 mai 2015.

*le cas ici, ce qui nous surprend fortement, car nous sommes présents en Guinée depuis 2013.*

*Par ailleurs, nous exprimons notre volonté de favoriser un dialogue constructif en vue d'étudier, ensemble, les modalités possibles pour rétablir nos bons rapports, dans le strict respect du cadre législatif, environnemental et social en vigueur.*

*Nous vous serions reconnaissants de bien vouloir nous communiquer les motifs précis ayant conduit à cette décision, ainsi que les conditions éventuelles permettant d'engager une démarche de négociation, le cas échéant. En effet, nous sommes titulaires d'un permis d'exploitation minière et avons été contraints de cesser nos activités en raison de ce décret surprenant qui nous a été imposé sans préavis ».*[16]

27.     Aucune réponse n'a été apportée à ce courrier.

28.     Par la suite, le 26 mai 2025, la Demanderesse a de nouveau écrit au Ministère des Mines et de la Géologie après la publication de l'Ordre de fermeture et la suspension forcée de l'Exploitation minière de la Demanderesse et a déclaré :

« *Nous tenons à rappeler, avec le plus grand respect pour l'autorité de vos départements, que la mine exploitée par la société Axis était en pleine activité, conformément à son Décret d'Octroi, et que la société Axis n'a commis aucune des infractions visées par le Décret de Retrait, notamment en ce qui concerne :*

*• le non-démarrage des travaux dans les délais requis,*

*• l'abandon d'activités minières,*

*• ou toute autre violation substantielle des obligations liées au permis.*

*Dans ces conditions, l'Ordre de Fermeture de la mine d'Axis est dépourvu de fondement légal et constitue une violation manifeste des droits acquis de notre société, ainsi qu'une atteinte injustifiée à la sécurité juridique des investissements.*

*En conséquence, nous avons l'honneur de solliciter respectueusement de votre haute autorité le retrait, dans un délai de 72 heures, de l'Ordre de Fermeture susvisé, ainsi*

---

[16]     **C-11**, Courrier d'Axis Minerals Resources SA au Ministère des Mines et de la Géologie du 19 mai 2025, p. 1.

> *que la confirmation écrite de la levée immédiate de toute mesure de suspension ou*
> *d'interruption des activités de la société Axis »*[17].

29.     Aucune réponse, pas même un accusé de réception, n'a été reçue de la part de la Guinée.

30.     De plus, la Demanderesse a tenté à plusieurs reprises de rencontrer les représentants du
        Ministère des Mines et de la Géologie, et plus largement, les représentants de la Défenderesse,
        afin de remédier aux mesures illicites de la Défenderesse. Toutes ces démarches sont restées
        vaines. La Défenderesse a refusé toute rencontre et n'a fourni aucune explication quant aux
        mesures prises.

31.     Le 12 juin 2025, la Demanderesse a écrit à la Défenderesse pour exposer sa position quant à
        l'illicéité du retrait des Droits miniers d'Axis et l'inviter à entamer une procédure de règlement
        amiable en vertu de l'article 219 du Code minier[18].

**D       Les violations par la Défenderesse du Code minier**

**D.1     Aucun motif valable ne justifie le retrait du Permis d'exploitation de la Demanderesse**

32.     L'article 1 du Décret du 14 mai prévoit que « *les périmètres couverts par les concessions*
        *minières, les permis d'exploitation industrielle et les permis d'exploitation semi-industrielle* »
        visés par ledit Décret, y compris le Permis d'exploitation de la Demanderesse, sont « *retirés et*
        *font gratuitement retour à l'État* », conformément aux dispositions des articles 3, 34, 77, 82,
        88, 89 et suivants du Code minier et de l'article 71 du Décret n° D/2014/012/PRG/SGG du 17
        janvier 2014 portant Gestion des Autorisations et des Titres Miniers (le « **Décret portant**
        **Gestion des Titres Miniers** »)[19].

33.     Le Code minier établit le cadre juridique général régissant le secteur minier en Guinée. Il définit
        notamment à ce titre :

        • les différentes catégories de titres miniers (recherche, exploitation, artisanat, etc.) ;

---

[17]     **C-12**, Courrier d'Axis Minerals Resources SA au Ministère des Mines et de la Géologie du 26 mai 2025,
         p. 1.

[18]     **C-13**, Courrier du cabinet Jones Day à la République de Guinée du 12 juin 2025 [avec accusé de réception
         de la Présidence] ; **C-14**, Courrier du cabinet Jones Day à la République de Guinée du 12 juin 2025 [avec
         accusé de réception du Ministère des Mines et de la Géologie].

[19]     **C-15**, Décret D/2014/012/PRG/SGG du 17 janvier 2014 portant gestion des autorisations et des titres
         miniers ; **C-16**, Traduction anglaise certifiée des dispositions pertinentes du Décret portant gestion des
         autorisations et des titres miniers, article 71.

- les conditions d'octroi de ces titres ;

- les droits et obligations des titulaires de titres et de l'État ; et

- les dispositions fiscales et environnementales applicables.

34.    Le Décret portant Gestion des Titres Miniers précise les règles de procédure applicables à la délivrance, au renouvellement, au transfert, à la suspension et au retrait des titres miniers. En particulier, ce Décret :

- décrit les étapes procédurales relatives aux demandes, évaluations techniques, approbations et publications ; et

- répartit les compétences institutionnelles en matière d'administration du droit minier en Guinée.

35.    La Demanderesse soutient qu'aucune des dispositions du Code minier n'a été violée, pas plus que l'article 71 du Décret. Chacune de ces dispositions est abordée ci-après.

36.    L'article 3 du Code minier dispose :

> « *Les Substances minérales ou fossiles contenues dans le sous-sol ou existant en surface, ainsi que les eaux souterraines et les gîtes géothermiques sont, sur le territoire de la République de Guinée ainsi que dans la Zone économique exclusive, la propriété de l'État et elles ne peuvent être, sous réserve du présent Code, et du Code Foncier et Domanial, susceptibles d'aucune forme d'appropriation privée.*
>
> *Toutefois, les titulaires de Titres d'exploitation minière ou Autorisation d'exploitation de Substances minières ou de carrières acquièrent la propriété des substances extraites. Les droits aux substances constituent une propriété distincte de celle de la surface* »[20].

37.    Comme le reconnaît l'article 3, bien qu'il existe une interdiction générale de l'appropriation privée des « *Substances minérales* », cette interdiction générale est assortie d'une réserve autorisant une telle appropriation dans les conditions prévues par le Code minier lui-même. L'article 3 reconnaît également expressément que les titulaires de Titres d'exploitation minière de substances minières ou de carrières, tels que la Demanderesse, acquièrent la propriété des substances extraites et disposent des droits de propriété sur la

---

[20]    **C-3**, Code minier, Article 3.

substance, distincts de la propriété du sol. Dès lors, l'article 3 ne saurait à lui seul fonder juridiquement le retrait du Permis d'exploitation de la Demanderesse opéré par le Décret du 14 mai.

38.    L'article 34 du Code minier impose notamment au titulaire d'un Permis d'exploitation minière industrielle des obligations « *de commencer les travaux de développement dans un délai maximum d'un à compter de la date de l'octroi du Permis* », faute de quoi « *il s'expose à une pénalité de retard de 100.000 USD par mois pendant les trois premiers mois* »[21]. Si, au terme de 18 mois à compter de la date d'octroi, le titulaire n'a toujours pas commencé les travaux, « *l'État se réserve le droit de procéder au retrait ou à l'annulation du Titre* »[22].

39.    Comme précisé aux paragraphes 19 à 21 ci-dessus, les travaux de développement ont débuté en 2019 (soit dans l'année suivant l'octroi du Permis d'exploitation de la Demanderesse, le 2 novembre 2018) et le site produit du minerai de bauxite depuis 2020 en quantités croissantes. Dès lors, l'article 34 ne saurait fonder juridiquement le retrait du Permis d'exploitation de la Demanderesse.

40.    L'article 77 du Code minier prévoit que les demandes de renouvellement des Permis de recherche, des Permis d'exploitation minière et des Concessions minières doivent être présentées « *au plus tard trois mois pour le Permis de recherche, ou six mois pour le Permis d'exploitation et la Concession minière, avant la fin de la période de validité en cours du Titre minier* »[23]. Par ailleurs, l'article 82 du Code minier prévoit qu'un titre minier ou une autorisation « *prend fin à l'expiration de la période pour laquelle il avait été accordé* », à l'issue de laquelle « *les droits qu'il conférait à son titulaire font gratuitement retour à l'État* »[24].

41.    Toutefois, comme indiqué au paragraphe 18 ci-dessus, la durée actuelle du Permis d'exploitation de la Demanderesse court jusqu'au 1er novembre 2033, ce qui ne permet pas de fonder le Décret du 14 mai. En conséquence, les articles 77 et 82 ne sauraient être opposés au Permis d'exploitation de la Demanderesse.

42.    L'article 88 du Code minier énumère les motifs précis pour lesquels les titres miniers et les autorisations délivrés en vertu du Code minier « *peuvent être retirés par l'autorité qui les a*

---

[21]    **C-3**, Code minier, Article 34.

[22]    **C-3**, Code minier, Article 34.

[23]    **C-3**, Code minier, Article 77.

[24]    **C-3**, Code minier, Article 82.

*émis* »[25]. L'article 71 du Décret portant Gestion des Titres Miniers prévoit également certaines situations dans lesquelles le retrait d'un permis d'exploitation industrielle ou semi-industrielle ou d'une concession minière peut être prononcé[26].

43.    Il est toutefois important de souligner que l'article 88 du Code minier impose une procédure spécifique à suivre pour tout retrait :

> « *Le retrait <u>ne peut intervenir qu'</u>après une mise en demeure adressée par le Ministre au titulaire du Titre minier ou de l'Autorisation invitant celui-ci à apporter, dans les délais ci-dessous, la preuve du respect de ses obligations avant la date de la mise en demeure :*
>
> • *un mois pour le Permis de recherche et les Autorisations, et*
>
> • *quarante-cinq jours pour le Permis d'exploitation et la Concession minière* ».[27]

44.    Cette exigence procédurale figure également à l'article 71 du Décret portant Gestion des Titres Miniers, qui dispose :

> « *Dans le cas où ces infractions sont constatées, la DNM* [Direction Nationale des Mines] *ou d'autres services compétents adresse au titulaire une mise en demeure de quarante-cinq (45) jours en lui rappelant les sanctions encourues du fait du manquement à ses obligations.*
>
> *Si, à l'expiration du délai précité, les obligations énoncées dans la mise en demeure n'ont pas été exécutées ou si la mise en demeure est restée sans suite, le permis d'exploitation industrielle ou semi-industrielle ou de concession minière fait l'objet d'un retrait par décret après consultation de la Commission Nationale des Mines, sans préjudice de l'application des pénalités prévues par le Code Minier.*
>
> *Dans le cas où après la mise en demeure, le titulaire du permis a commencé par entreprendre des mesures de régularisation, il peut lui être encore accordé un délai de quatre-vingt-dix (90) jours pour se mettre à jour de toutes les obligations. Si à l'issue de ce délai les obligations requises ne sont pas satisfaites, le permis d'exploitation*

---

[25]    **C-3**, Code minier, Article 88.

[26]    **C-15**, Décret D/2014/012/PRG/SGG du 17 janvier 2014 portant gestion des autorisations et des titres miniers ; **C-16**, Traduction anglaise certifiée des dispositions pertinentes du Décret portant gestion des autorisations et des titres miniers, article 71.

[27]    **C-3**, Code minier, Article 88.

*industrielle ou semi-industrielle ou la concession minière fait l'objet d'un retrait pas décret »[28].*

45.     En l'espèce, la Défenderesse n'a adressé aucune mise en demeure préalable et n'a invoqué aucun motif de retrait du Permis d'exploitation de la Demanderesse. Malgré les demandes immédiates et réitérées d'explications (comme exposé aux paragraphes 25 à 31 ci-dessus), il n'en demeure pas moins qu'aucune explication n'a été fournie à la Demanderesse concernant le retrait de son Permis d'exploitation par le Décret du 14 mai.

46.     Il en résulte que non seulement aucun fondement légitime ne justifie l'inclusion de la Demanderesse dans le Décret du 14 mai, mais également que la Défenderesse n'a pas respecté la procédure obligatoire de retrait des permis d'exploitation minière, telle que prévue à l'article 88 du Code minier. Par conséquent, le Décret du 14 mai est entaché d'illicéité et/ou de nullité, ayant été adopté en l'absence de tout fondement juridique valable.

**D.2     La violation des « *Libertés générales* » de la Demanderesse garanties par le Code minier**

47.     L'article 95 du Code minier intitulé « *Libertés générales* » dispose que :

> « *Dans le cadre des accords internationaux et du respect des lois et règlements de la République de Guinée, sont garantis aux personnes visées à l'article 15 :*

> - *le droit de disposer librement de leurs biens et d'organiser leur entreprise ;*

> - *le droit d'embauche et de licenciement conformément aux lois et règlements en vigueur ;*

> - *le libre accès aux matières ;*

> - *la libre circulation en République de Guinée de leur personnel et de leurs produits ;*

> - *le droit d'importer des biens et services ainsi que des fonds nécessaires aux activités ;*

---

[28]     **C-15**, Décret D/2014/012/PRG/SGG du 17 janvier 2014 portant gestion des autorisations et des titres miniers ; **C-16**, Traduction anglaise certifiée des dispositions pertinentes du Décret portant gestion des autorisations et des titres miniers, article 71.

- *le droit de disposer des produits sur les marchés internationaux ; d'exporter et de disposer des produits sur les marchés extérieurs »[29].*

48. Les personnes désignées sont décrites à l'article 15 (intitulé « *Droits des personnes* ») du Code minier comme suit :

> « *Peuvent faire la reconnaissance d'indices, la recherche de Substances minières ou de carrières, dans les conditions de la présente loi, toutes personnes physiques ou morales possédant les capacités techniques et financières nécessaires pour mener à bien ces activités.*
>
> *Peuvent exploiter des Substances minières ou de carrières, dans les conditions de la présente loi :*
>
> - *toute personne physique ou morale, publique ou privée, de droit guinéen justifiant des capacités techniques et financières pour entreprendre l'exploitation sollicitée ;*
>
> - *toute personne physique ou morale de nationalité guinéenne dûment autorisée à se livrer à l'exploitation semi-industrielle ou artisanale.*
>
> *Un décret du Président de la République précise le contenu de ce qu'on entend par 'Capacités techniques et financières' »[30].*

49. L'article 90 du Décret portant Gestion des Titres Miniers précise le contenu de la « *Capacité technique et financière* » aux fins de l'article 15 du Code minier dans les termes suivants :

> « *Aux fins de l'article 15 du Code minier, les 'capacités techniques et financières' sont les exigences minimum de capacités professionnelles, techniques et financières que le pouvoir adjudicateur ou l'Administration estime indispensable pour qu'un demandeur puisse se voir octroyé un titre minier ou une autorisation.*

---

[29]     **C-3**, Code minier, Article 95.

[30]     **C-3**, Code minier, Article 15.

16

> *Les existences du pouvoir adjudicateur ou de l'Administration quant aux capacités financières et techniques doivent être proportionnées et adaptées à la nature du gisement et au type de titre ou d'autorisation dont l'octroi est sollicité* »[31].

50.     En tant que société constituée selon le droit guinéen et titulaire d'un permis d'exploitation (à savoir, le Permis d'exploitation de la Demanderesse) en vertu duquel une mine était en activité (à savoir, l'Exploitation minière de la Demanderesse qui produisait du minerai de bauxite jusqu'au Décret du 14 mai), la Demanderesse est une personne désignée en vertu de l'article 15 et bénéficie des « *Libertés générales* » garanties par l'article 95 du Code minier.

51.     Dans la mesure où le Décret du 14 mai ne constitue ni un retrait légal ni un retrait valable du Permis d'exploitation de la Demanderesse, celle-ci soutient que toutes les mesures prises par les agents et les organes gouvernementaux de la Défenderesse en exécution du Décret du 14 mai à l'égard de l'Exploitation minière de la Demanderesse ont été réalisés de manière illicite et en violation des « *Libertés générales* » garanties à la Demanderesse en vertu de l'article 95 du Code minier.

52.     Ces violations des « *Libertés générales* » de la Demanderesse incluent, sans s'y limiter, des atteintes à ses droits :

52.1     de disposer librement de ses biens et d'organiser son entreprise ;

52.2     à la libre circulation de son personnel et de ses produits sur le territoire de la République de Guinée ; et

52.3     de vendre ses produits sur les marchés extérieurs, d'exporter et de les écouler sur les marchés étrangers

en raison de la suspension forcée des activités mise en œuvre par la police guinéenne en application du Décret du 14 mai et/ou de l'Ordre de fermeture émis par la Direction Générale de la Police nationale (voir paragraphe 24 ci-dessus).

**E      La compétence juridictionnelle**

53.     La convention d'arbitrage est énoncée à l'article 219 du Code minier guinéen de 2011 :

---

[31]     **C-15**, Décret D/2014/012/PRG/SGG du 17 janvier 2014 portant gestion des autorisations et des titres miniers ; **C-16**, Traduction anglaise certifiée des dispositions pertinentes du Décret portant gestion des autorisations et des titres miniers, article 90.

> *« Les différends opposant un ou plusieurs investisseurs miniers à l'État et relatifs à l'étendue de leurs droits et obligations, à l'exécution ou l'inexécution de leurs engagements à la fin de leurs Titres, à la cession, la transmission ou l'Amodiation de leurs droits qui en résultent peuvent être soumis à la procédure de règlement amiable.*
>
> *Si une des parties estime que la procédure amiable a échoué, le différend est porté, soit devant les tribunaux guinéens compétents, soit à l'arbitrage national ou international.*
>
> *Dans tous les autres cas, les différends résultant de l'interprétation et de l'application du présent Code sont portés devant les tribunaux guinéens compétents »*[32].

54. Ainsi qu'il ressort clairement du libellé de l'article 219, une partie lésée peut choisir l'un des trois fors approuvés au préalable pour trancher définitivement tout différend, et l'autre partie s'est irrévocablement soumise à ce for choisi en vertu de l'article 219.

55. Comme exposé aux paragraphes 12 à 21 ci-dessus, la Demanderesse a réalisé des investissements importants, tant financiers que non financiers, sur une période significative afin de mener des activités de recherche en Guinée, d'obtenir le Permis d'exploitation de la Demanderesse, puis de mettre en place l'Exploitation minière de la Demanderesse en Guinée. La Demanderesse est donc un « *investisseur minier* » au sens du Code minier et bénéficie, à ce titre, du mécanisme de règlement des différends prévu à l'article 219 du Code minier.

56. Comme précisé aux paragraphes 32 à 52 ci-dessus, un différend manifeste s'est cristallisé entre la Demanderesse et la Défenderesse concernant l'existence (et donc l'étendue) des droits de la Demanderesse en vertu du Permis d'exploitation de la Demanderesse, les obligations y afférentes de la Défenderesse, ainsi que les obligations de la Défenderesse de se conformer au Code minier et de respecter les garanties qu'elle a accordées à la Demanderesse en vertu dudit Code.

57. Comme indiqué ci-dessus, par courrier du 12 juin 2025, la Demanderesse a écrit à la Défenderesse afin de solliciter l'ouverture d'une procédure de règlement amiable. Dans le cadre de cette correspondance et afin de préserver le *statu quo* dans l'attente de l'issue de cette procédure, la Demanderesse a demandé à la Défenderesse :

57.1 *« de prendre toutes les mesures nécessaires afin de garantir que le Décret du 14 mai ne s'applique pas à Axis et que les Droits miniers d'Axis soient pleinement rétablis ; et*

---

[32]    **C-3**, Code minier, Article 219.

57.2     *« de prendre toutes les mesures nécessaires pour permettre à la mine de Koniokhouré de reprendre ses activités dans les mêmes conditions qu'avant l'adoption du Décret du 14 mai, ce qui inclut, sans s'y limiter, la levée de tous les ordres et instructions ayant conduit à la suspension des opérations de la mine de Koniokhouré, y compris le retrait de l'Ordre de fermeture »*[33].

58.     Dans son courrier du 12 juin 2025, la Demanderesse a demandé à la Défenderesse de confirmer par écrit son accord pour participer à la procédure de règlement amiable prévue à l'article 219 du Code minier. Le courrier du 12 juin 2025 précisait que l'absence de réponse de la Défenderesse dans le délai imparti serait considérée par la Demanderesse comme un refus d'y participer, impliquant dès lors l'échec du règlement amiable prévue à l'article 219, et que la Demanderesse entendait engager une procédure devant le for de son choix, conformément à l'article 219 du Code minier.

59.     Le 13 juin 2025, la Demanderesse a reçu la confirmation (sous forme d'exemplaires portant le cachet de décharge) que le courrier du 12 juin 2025 avait été reçu au plus tard le 13 juin 2025, par le Secrétariat Central de la Présidence de la République de Guinée et le Ministère des Mines et de la Géologie[34], au nom de la Défenderesse.

60.     Aucune réponse n'a été reçue. En conséquence, le 3 juillet 2025, la Demanderesse a adressé un nouveau courrier à la Défenderesse sollicitant la conduite de discussions à l'amiable, ainsi qu'une réponse. Ce courrier a été reçu par le Secrétariat Central de la Présidence de la République de Guinée[35], le Ministère des Affaires étrangères, de l'Intégration africaine et des Guinéens établis à l'Étranger[36], ainsi que le Ministère des Mines et de la Géologie[37], pour le compte de la Défenderesse.

---

[33]     **C-13**, Courrier du cabinet Jones Day à la République de Guinée du 12 juin 2025 [avec accusé de réception de la Présidence] ; **C-14**, Courrier du cabinet Jones Day à la République de Guinée du 12 juin 2025 [avec accusé de réception du Ministère des Mines et de la Géologie].

[34]     **C-13**, Courrier du cabinet Jones Day à la République de Guinée du 12 juin 2025 [avec accusé de réception de la Présidence] ; **C-14**, Courrier du cabinet Jones Day à la République de Guinée du 12 juin 2025 [avec accusé de réception du Ministère des Mines et de la Géologie].

[35]     **C-17**, Courrier du cabinet Jones Day à la République de Guinée du 3 juillet 2025 [avec accusé de réception de la Présidence].

[36]     **C-18**, Courrier du cabinet Jones Day à la République de Guinée du 3 juillet 2025 [avec accusé de réception du Ministère des affaires étrangères, de l'Intégration africaine et des guinéens établie à l'étranger].

[37]     **C-19**, Courrier du cabinet Jones Day à la République de Guinée du 3 juillet 2025 [avec accusé de réception du Ministère des Mines et de la Géologie].

61.     À ce jour, aucune réponse n'a été reçue de la Défenderesse. En outre, la Demanderesse n'a jamais reçu de notification officielle du Décret du 14 mai de la part de la Défenderesse.

62.     En raison des éléments détaillés aux paragraphes 26 à 31 et 57 à 61 ci-dessus, la Demanderesse considère que la procédure de règlement amiable prévue à l'article 219 du Code minier a échoué.

63.     En conséquence, la Demanderesse introduit par la présente une procédure d'arbitrage international sur le fondement de l'article 219 du Code minier.

**F      L'exécution du prétendu retrait du Permis d'exploitation de la Demanderesse par la Défenderesse est suspendue du fait du recours formée contre cette décision dans la présente Demande d'arbitrage conformément à l'article 89 du Code minier**

64.      L'article 89 du Code minier énonce ce qui suit :

> « *Le recours exercé contre la décision de retrait avant l'expiration d'un délai de soixante jours à compter de la notification de cette décision en suspend l'exécution.*
>
> *La décision de retrait peut toutefois subordonner l'effet suspensif d'un recours éventuel à la constitution par le titulaire d'une caution de garantie dont le montant serait acquis à l'État en cas de rejet du recours* »[38].

65.     L'article 89 ne désigne aucune autorité spécifique chargée de recevoir et de statuer sur le recours qu'il prévoit, ce qui implique que tout différend à ce titre doit être tranché selon la clause générale de règlement des différends figurant à l'article 219. En conséquence, tout recours formé en vertu de l'article 89 peut, au choix de la partie lésée, être porté devant l'un des trois forums prévus à l'article 219 pour le règlement des différends entre un investisseur minier et l'État guinéen « *relatifs à l'étendue de leurs droits et obligations* »[39].

66.     Conformément aux articles 89 et 219 du Code minier, la Demanderesse choisit l'arbitrage international pour statuer sur son recours en vertu de l'article 89, lequel est introduit par la présente Demande d'arbitrage.

67.     En outre, il convient de relever que :

---

[38]    **C-3**, Code minier, Article 89.

[39]    **C-3**, Code minier, Article 219.

67.1    comme précisé au paragraphe 61 ci-dessus, la Demanderesse n'a reçu aucune notification officielle du Décret du 14 mai. Par conséquent, aucune notification officielle de la décision de la Défenderesse de retirer le Permis d'exploitation de la Demanderesse n'a été effectuée aux fins de l'article 89 ; et

67.2    Le Décret du 14 mai ne prévoyait pas que l'effet suspensif d'un recours soit conditionné à la constitution d'une garantie par le titulaire du permis, en cas de rejet du recours. Par conséquent, la suspension de l'exécution prévue à l'article 89 n'est soumise à aucune condition et prend donc effet immédiatement à compter de l'introduction du recours de la Demanderesse dans la présente procédure.

68.    Il s'ensuit qu'en application de l'article 89 du Code minier, l'exécution du Décret du 14 mai par la Guinée, en tant qu'il prétend révoquer le Permis d'exploitation de la Demanderesse, est suspendue dans l'attente de l'issue du recours introduit dans le cadre de la présente procédure.

**G      La nomination de l'Arbitre et la constitution du Tribunal**

69.    La convention d'arbitrage international énoncée à l'article 219 du Code minier ne prescrit pas la manière dont le Tribunal doit être constitué, laissant à la partie lésée le soin d'en décider.

70.    Conformément à son droit d'engager une procédure d'arbitrage international sur le fondement de l'article 219, la Demanderesse choisit que le siège de l'arbitrage soit fixé à New York (New York, États-Unis), et opte pour un arbitrage conduit par un Tribunal arbitral international composé de trois membres[40].

71.    Conformément aux procédures généralement reconnues pour les arbitrages internationaux complexes, la Demanderesse et la Défenderesse nommeront chacune un Arbitre (l'« **Arbitre désigné par la partie** »). Puis un troisième Arbitre (le « **Troisième Arbitre** ») sera nommé conjointement par les Arbitres désignés par les Parties pour présider le Tribunal arbitral. Une fois constitué, le Tribunal déterminera, sans délai, les règles applicables à cet arbitrage ad hoc et rendra une ordonnance de procédure à cette fin. La Demanderesse estime que le Règlement d'arbitrage international non-administré (2018) du CPR (le « **Règlement CPR** »), publié par le *International Institute for Conflict Prevention & Resolution* (« **CPR** »), sis au 30 East 33rd Street, 6e étage, New York, NY 10016, devrait être adopté et régir la présente procédure.

---

[40]    Tout comme la Défenderesse, les États-Unis d'Amérique sont parties à la Convention pour la reconnaissance et l'exécution des sentences arbitrales étrangères, signée le 10 juin 1058 et entrée en vigueur le 7 juin 1959 (la « **Convention de New York** »).

Conformément à l'article 3.2 du Règlement CPR, le présent arbitrage sera réputé avoir commencé à la date de réception de la présente Demande d'arbitrage par la Défenderesse.

72.    La Demanderesse nomme par la présente, O. Thomas Johnson, de McLean, Virginie (États-Unis), en qualité d'Arbitre désigné par la partie Demanderesse dans le cadre de ce différend.

73.    Les coordonnées de M. Thomas Johnson sont les suivantes:

O. Thomas Johnson
1406 Langley Pl.
McLean, VA 22101
États-Unis d'Amérique
Téléphone : +1 202 390 2637
Courriel : thomas.johnson022@gmail.com

74.    Dans un délai de 30 jours à compter de la réception de la présente Demande d'arbitrage, la Défenderesse est tenue de notifier par écrit une Réponse à cette Demande d'arbitrage, exposant :

74.1    toute observation que la Défenderesse jugerait appropriée relativement à la présente Demande d'arbitrage ;

74.2    un exposé des arguments de défense de la Défenderesse ;

74.3    le nom, l'adresse, le numéro de téléphone et l'adresse email de l'arbitre nommé par la Défenderesse ; et

74.4    une indication sur son éventuelle opposition à l'application du Règlement CPR à la présente procédure arbitrale.

75.    À défaut, pour la Défenderesse, de signifier une Réponse et/ou de désigner son Arbitre désigné par la partie et/ou de faire connaître sa position quant au règlement applicable dans le délai imparti de 30 jours, la Demanderesse se réserve le droit de solliciter une ordonnance auprès du Tribunal fédéral des États-Unis pour le district sud de New York (*U.S. District Court for the Southern District of New York*) ou de toute autre juridiction ou tribunal compétent en vue de contraindre à la procédure arbitrale selon les modalités suivantes[41]:

---

[41]    La Demanderesse se réserve également le droit de solliciter toute mesure accessoire nécessaire ou appropriée.

22

75.1    Le CPR (ou toute autre autorité de nomination désignée par le Tribunal) procédera à la nomination d'un Arbitre au nom de la Défenderesse ;

75.2    Les deux Arbitres ainsi désignés s'efforceront alors de parvenir à un accord sur la nomination du Troisième Arbitre, lequel présidera le Tribunal arbitral ;

75.3    Dans l'hypothèse où les Arbitres désignés par la Demanderesse et la Défenderesse ne parviendraient pas à un accord sur la désignation du Troisième Arbitre dans un délai de 20 jours, le CPR procédera également à la nomination de ce Troisième Arbitre ;

75.4    Une fois constitué, le Tribunal arbitral administrera l'arbitrage international relatif au présent différend conformément au Règlement CPR (ou à toute autre règle que le Tribunal pourrait désigner).

**H    Droit applicable**

76.    Les demandes formulées par la Demanderesse étant fondées sur le Code minier guinéen, le droit matériel applicable à ces demandes est le droit guinéen.

**I    Langue de l'arbitrage**

77.    La Demanderesse choisit l'anglais comme langue d'arbitrage et sollicitera une décision en ce sens.

**J    Demandes**

78.    La Demanderesse sollicite respectueusement du Tribunal arbitral qu'il prenne les décisions ci-après :

78.1    Déclarer que le retrait par la Défenderesse du Permis d'exploitation de la Demanderesse en vertu du Décret du 14 mai n'est pas conforme au Code minier et est donc illicite et/ou dénué d'effet ;

78.2    Déclarer que le Permis d'exploitation de la Demanderesse demeure valide et en vigueur conformément aux conditions dans lesquelles il a été délivré par le Décret D/2018/267/PRG/SGG ;

78.3    Déclarer que la Demanderesse est, était et demeure en droit de poursuivre l'Exploitation minière de la Demanderesse ;

23

78.4    Ordonner et déclarer que la Défenderesse *(i)* s'abstient de toute mesure visant à interférer avec les droits de la Demanderesse en vertu du Permis d'exploitation de la Demanderesse et/ou du Code minier et (*ii*) prendra toutes les mesures nécessaires pour rétablir les droits de la Demanderesse qui auraient déjà été affectés ou compromis par des mesures prises par la Défenderesse ou de l'un de ses agents ou entités ;

78.5    Si nécessaire, la Demanderesse se réserve le droit de solliciter des mesures conservatoires ou provisoires auprès du Tribunal (ou, à défaut, d'une juridiction de contrôle compétente) pour donner effet à la suspension de l'exécution du Décret du 14 mai, dans la mesure où celui-ci affecte la Demanderesse, ou toute autre mesure équivalente, dans l'attente de la formation du Tribunal ou de la décision finale sur les demandes de la Demanderesse dans la présente procédure. Ces mesures pourraient inclure l'interdiction faite à la Défenderesse de prendre toute mesure supplémentaire en application du Décret du 14 mai en ce qu'il concerne le Permis d'exploitation de la Demanderesse, y compris, sans s'y limiter :

78.5.1    L'absence de cessation de l'exécution de l'Ordre de fermeture ;

78.5.2    L'absence de cessation de toute autre activité de la police guinéenne ou de tout autre agent ou entité de l'État visant à entraver la reprise et le bon déroulement de l'Exploitation minière de la Demanderesse.

78.6    La Demanderesse se réserve également le droit de demander d'autres mesures conservatoires ou provisoires, si nécessaire, afin de faire respecter et soutenir la présente procédure d'arbitrage et/ou de préserver ses droits et/ou le statu quo, y compris, sans s'y limiter, le dépôt d'une requête aux fins de contraindre l'arbitrage.

78.7    Condamner la Guinée aux frais de la présente procédure ; et

78.8    Ordonner toute autre mesure que le Tribunal jugera appropriée.

79.    Dans l'hypothèse où les demandes principales de la Demanderesse seraient jugées irrecevables ou infondées pour quelque raison que ce soit, la Demanderesse se réserve le droit de solliciter toute autre mesure de réparation, y compris, mais sans s'y limiter, des dommages-intérêts. La Demanderesse se réserve également le droit de modifier, compléter ou rectifier ses demandes de réparation, notamment en ce qui concerne toute réclamation ou demande de mesures probatoires, selon ce qui pourrait s'avérer justifié au cours de la procédure et dans les limites permises par les règles de procédure applicables.

**K**     **Dispositions finales**

80.     Tous les documents relatifs à la présente procédure d'arbitrage devront être signifiés aux conseils de la Demanderesse aux adresses de New York et de Londres indiquées au paragraphe 5.


*[Signature]*

**Fait le 10 juillet 2025 au nom de la Demanderesse par le cabinet Jones Day sis :**

**250 Vesey Street, New York, New York 10281-1047**

**21 Tudor Street, Londres EC4Y 0DJ**